IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,724

In the Interests of D.G. JR., U.G., C.A., and DI.G.,
Minor Children.

SYLLABUS BY THE COURT

1.

When a child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future.

2.

When reviewing findings of parental unfitness, appellate courts view all the evidence in a light most favorable to the State and decide whether a rational fact-finder could have found it highly probable—i.e., by clear and convincing evidence—that the parent was unfit. In making this decision, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact.

3.

If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would best be served by termination of parental rights, the court shall so order.

1

Review of the judgment of the Court of Appeals in an unpublished opinion filed July 21, 2023. Appeal from Johnson District Court; ERICA K. SCHOENIG, judge. Oral argument held March 29, 2024. Opinion filed September 13, 2024. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Richard P. Klein*, of Lenexa, argued the cause and was on the briefs for appellant Father.

*Kendall S. Kaut*, assistant district attorney, argued the cause, and *Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: This appeal involves the termination of Father's parental rights to his four minor children. The children were adjudicated as children in need of care (CINC) and placed together in foster care due to Mother's suspected illegal drug use, the family's unstable living situation, and the parents' noncompliance with a medical safety plan to address one of their children's special needs after birth. In the three years following adjudication, Father relied on Mother as the exclusive point of contact with the agencies and organizations and maintained throughout the case that Mother would be the primary caretaker of the children upon reintegration because he worked long hours. Yet Mother was repeatedly incarcerated and failed multiple drug tests while the case was pending. And Mother submitted falsified documentation of some reintegration tasks, including forged drug test results and parenting class completion certificates for both her and Father. Although Father was appropriate with the children during scheduled visits, he was not otherwise engaged in the reintegration process in Kansas and failed to meet the goals necessary for reintegration as provided in his own separate, court-ordered reintegration plan.

After three extensions to the parents' reintegration plans without sufficient progress and two failed attempts to have the children placed in Missouri where the parents recently bought a home, the district court terminated parental rights. The Court of Appeals panel affirmed the termination decision as to both parents. *In re D.G.*, No. 125,724, 2023 WL 4675379, at *12 (Kan. App. 2023) (unpublished opinion). We granted Father's petition for review to determine whether the district court properly considered his factors of unfitness separate from Mother's, and whether the court's decision to terminate Father's parental rights was an abuse of its discretion. Finding no error, we affirm.

FACTS

In March 2019, Kansas Department for Children and Families (DCF) received a report that Mother tested positive at the hospital for amphetamines while 32 weeks pregnant. U.G. was born over a month later, several weeks premature, and was diagnosed with transient tachypnea: a lung condition that can cause breathing problems and requires monitoring. U.G. was initially placed in the Neonatal Intensive Care Unit (NICU) to be monitored, where he received oxygen and was on a feeding tube for the first two days of his life.

Before being released from the hospital, Mother and Father met with a hospital social worker and collectively agreed to a verbal safety plan to address U.G.'s health needs which included the following directives: notify the hospital of U.G.'s pediatrician or seek help in setting up that appointment, take U.G. to the doctor and send the hospital those records, follow instructions from nurses and doctors in regards to U.G.'s health needs, ensure a safe home environment for U.G. and the other children, recognize signs of hypoxia and malnutrition and how to provide emergency care if U.G. stops breathing, cooperate with Children's Mercy home healthcare, and Father will serve as the children's primary caregiver. The home healthcare services were intended to help parents learn

3

infant CPR and safe sleep practices, set up a SIDS monitor, measure U.G.'s weight and nutritional status, and provide an extra set of eyes on U.G. in the early weeks of his life. DCF also did a walk-through of the family's living quarters at the time, an Extended Stay motel room.

Several days after Mother and U.G. were released from the hospital, DCF received a report that U.G. had missed a scheduled well-baby check-up and that Father had cancelled the first home healthcare appointment with Children's Mercy and told staff not to call again. DCF repeatedly contacted the parents' cell phones and hotel room phone and also visited the hotel where the family was staying but was unable to reach the parents. Hotel staff reported to DCF the family was in and out of the room during this time. Apparently on the same day that DCF was attempting to make contact, Mother was arrested and went to jail.

In response, the State initiated CINC proceedings on behalf of three-year-old C.A., one-year-old D.G. Jr., and two-week-old U.G., citing lack of parental care necessary for the physical, mental, or emotional health of the children and a corresponding risk of abuse or neglect under K.S.A. 38-2202(d)(1)-(3), (d)(11). As for U.G., the State characterized the situation as an "emergency" necessitating immediate out-of-home placement due to his health concerns and the parents' noncompliance with the medical safety plan. Based on the information presented in the State's petition, the Johnson County District Court granted the State temporary custody of C.A., D.G. Jr., and U.G., noting specific concerns about Mother's use of illegal substances and the parents' lack of cooperation with a safety plan to care for a medically fragile infant.

In August 2019, the district court adjudicated C.A., D.G. Jr., and U.G. as CINC. In a September 2019 journal entry filed to document the adjudication, the district court ordered Mother and Father be offered separate, six-month reintegration plans, prepared by KVC as the case management provider. Although Father failed to include the parents'

reintegration plans in the record on appeal, it appears from testimonial evidence presented throughout the termination hearing that the parents were to complete the following reintegration tasks: housing, employment, transportation, visitation, and parenting classes. Mother also needed to abstain from using illegal drugs. The court would ultimately extend the parents' reintegration plans three times to give them additional opportunities to meet these requirements.

About a year after the CINC case began, Mother gave birth to Di.G. who was in the NICU for a short stay after birth, then taken into state custody by DCF. Di.G. was eventually placed into foster care with her siblings. The State amended its CINC petition to include Di.G., and the district court found her to be a CINC in its termination ruling issued in September 2022.

In January 2021, the State filed a Motion for Finding of Unfitness and Termination of Parental Rights. At this point, C.A., D.G. Jr., and U.G. had been in an out-of-home placement for over 20 months. Yet the termination hearing was postponed for almost another year to permit parents more time to work towards reintegration. During this time, the parents bought a home in Raytown, Missouri, even though the children were involved in the consolidated CINC case in Kansas. This required the parents to initiate the interstate placement process under the Interstate Compact on the Placement of Children (ICPC) to have the Missouri home considered as an appropriate out-of-state placement for the children. But the process ultimately failed, apparently because the parents failed to submit the required paperwork and because of other setbacks in the case. These setbacks included concerns about Mother's continued substance abuse and her dishonesty with KVC by submitting multiple falsified drug test results and forging completion certificates for parenting classes on behalf of both parents.

In August 2022, over three years after the CINC case was filed, the parties appeared for a two-day hearing to resolve the State's motion to terminate Mother's and Father's parental rights to the four children. At the time of the hearing, C.A. was 6 years old, D.G. Jr. was 4 years old, U.G. was 3 years old, and Di.G. was 1 1/2 years old. All the children had spent the majority of their lives in state custody and in the same foster placement. The court heard from nearly a dozen witnesses, including case managers, social workers, family therapists, Mother, the foster parent, and an employee from one of the labs that evaluated Mother's drug test results.

The State and the guardian ad litem both argued for termination. Represented by separately appointed attorneys, both parents argued against termination and requested another extension of their reintegration plans. Mother testified, but Father did not. Through counsel, Father conceded Mother's substance use problem and dishonesty had hindered reintegration efforts but also pointed to the lack of trust between parents and KVC and DCF as complicating factors. Father claimed he completed many steps towards reintegration, including stable employment, housing, transportation, and visitation. He also argued he displayed the ability to care for the children, as demonstrated when the children were still living at home and during visits, including while Mother was in jail. But Father also agreed with the State's summation that he and Mother "are a team," that his "situation is tied to [hers]," and that his "success depends on [her] success."

In September 2022, the district court issued its termination decision. The court found both parents were unfit to properly care for C.A., D.G. Jr., U.G., and Di.G., and that parental unfitness is unlikely to change in the foreseeable future. See K.S.A. 38-2269(a) (The court may terminate parental rights when there is clear and convincing evidence of parental unfitness that is unlikely to change in the foreseeable future.). In making its unfitness determination about Father, the court expressly considered the statutory factors set forth in K.S.A. 38-2269(b)(4) (physical, mental, or emotional abuse of a child), K.S.A. 38-2269(b)(7) (failure of reasonable efforts by public or private

6

agencies to rehabilitate the family), K.S.A. 38-2269(b)(8) (lack of effort by parent to adjust circumstances to meet needs of child), and K.S.A. 38-2269(c)(3) (failure to complete reasonable, court-ordered reintegration plan).

Based on these factors and after making numerous findings of fact, the district court found the State had proved by clear and convincing evidence that Father is unfit to care for the four children and that his unfitness is unlikely to change in the foreseeable future. The court also concluded termination of parental rights was in the children's best interests.

On appeal, the panel affirmed the district court's termination decision, holding (1) the court's unfitness determination was supported by clear and convincing evidence and (2) its termination decision was a "sound exercise of the court's discretion and consistent with the children's best interests." *In re D.G.*, 2023 WL 4675379, at *12.

ANALYSIS

K.S.A. 38-2269 sets forth the facts and circumstances a court must consider when deciding whether to terminate parental rights. Two subsections of this statute are relevant here:

> "(a) When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future.
>
> . . . .

7

"(g)(1) If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 38-2269(a), (g)(1).

## I.  *K.S.A. 38-2269(a): unfit and unfitness unlikely to change in the foreseeable future*

*Standard of Review*

When reviewing findings of parental unfitness, appellate courts view all the evidence in a light most favorable to the State and decide whether a rational fact-finder could have found it highly probable—i.e., by clear and convincing evidence—that the parent was unfit. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008). In making this decision, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

Father argues the panel erred in affirming the district court's order terminating his parental rights because the district court's unfitness findings were not supported by clear and convincing evidence.

### A.  *Unfit by conduct or condition*

To determine whether a parent is unfit, the district court must consider a nonexclusive list of statutory factors, any one of which may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(b), (c), (f). Here, the district court found Father unfit based on four statutory factors:

1.  K.S.A. 38-2269(b)(4) (U.G. only) (physical, mental, or emotional abuse or neglect);

2.  K.S.A. 38-2269(b)(7) (failure to rehabilitate family despite agency's reasonable efforts);

3.  K.S.A. 38-2269(b)(8) (lack of effort by parent to adjust circumstances, conduct, or conditions to meet needs of child); and

4.  K.S.A. 38-2269(c)(3) (failure to carry out a reasonable plan approved by the court directed toward integration of child into parental home).

Father argues there is insufficient evidence to support the district court's findings of unfitness under each of these statutory factors. We address each of Father's arguments in turn.

1.  *Physical, mental, or emotional abuse or neglect or sexual abuse of a child (U.G. only), K.S.A. 38-2269(b)(4)*

Father concedes "there was evidence of concerns presented involving U.G." based on how he handled U.G.'s special medical needs after birth but argues these facts on their own do not rise to the level of physical, mental, or emotional abuse or neglect. He asserts "[m]issing a medical appointment and not cooperating with service providers" may be grounds for removing a child from the home and a CINC adjudication but are insufficient to establish clear and convincing evidence of abuse or neglect warranting a finding of unfitness for termination of parental rights. Based on the statutory definitions in the Kansas Code for Care of Children and the factual record here, we disagree.

K.S.A. 38-2202 provides the statutory definitions of "neglect" and "physical, mental or emotional abuse" of a child, as those terms are used in K.S.A. 38-2269(b)(4).

"(t) 'Neglect' means acts or omissions by a parent, guardian or person responsible for the care of a child resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the child's parents or other custodian.

. . . .

"(y) 'Physical, mental or emotional abuse' means the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered." K.S.A. 38-2202.

The record and evidence presented at the hearing support the district court's findings on this factor, consistent with the applicable statutory definitions. At the time U.G. was discharged from the hospital, he had documented medical needs requiring a special feeding protocol initially and then therapeutic interventions for the first year of life. Both parents agreed to and signed a medical safety plan before leaving the hospital to address these needs, a condition of U.G.'s release. Yet the parents still missed U.G.'s follow up doctor appointment less than a week after discharge and failed to otherwise adhere to the DCF medical safety plan. Father affirmatively rejected home healthcare services necessary for U.G. and personally told medical staff not to contact the family again. In doing so, Father ignored his obligation under the agreed-upon medical safety plan to cooperate with Children's Mercy home healthcare and to serve as the primary care provider for U.G. The court found the poor decisions of both parents put U.G.'s physical health at significant risk.

Considering the evidence in the light most favorable to the State, we conclude a rational fact-finder could have found it highly probable Father was unfit under K.S.A. 38-2269(b)(4) because he engaged in an act or omission presenting a likelihood of harm to

U.G. (neglect) or because he mistreated U.G. to the extent the child's health was endangered (physical, mental, or emotional abuse of a child).

2. *Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, K.S.A. 38-2269(b)(7)*

As to the district court's findings under K.S.A. 38-2269(b)(7) that reasonable efforts of appropriate public or private agencies failed to rehabilitate the family, Father argues KVC did not address Mother's substance use problem and dishonesty, which he concedes hindered family reintegration.

The phrase "reasonable efforts" is not susceptible to precise definition, and its meaning depends largely upon the facts and circumstances of the particular case. It is reasonable to expect family service agencies to work with families to create a case plan outlining specific goals, tasks, and timelines for reintegration. And it is similarly reasonable to expect agencies to monitor compliance with the case plan and progress toward completing tasks and attaining goals.

Here, the court-ordered case plan KVC developed required Mother to: obtain a mental health assessment, complete recommended therapy, abstain from illegal drugs and undergo regular UAs, obtain necessary drug treatment, and resolve her ongoing legal issues, including to successfully complete probation. The record reflects KVC supported Mother's requirement of abstaining from illegal drugs by requesting documentation of drug test results and completion of a drug and alcohol assessment. KVC also provided Mother with counseling services to support her mental health needs.

Despite KVC's efforts, Mother went to great lengths to avoid being monitored for illegal drug use, including hiding two pregnancies and giving birth out of state, repeatedly missing scheduled UAs, and falsifying toenail and hair follicle drug test

11

results. She also forged certificates of completion for substance abuse treatment and parenting classes (for her and Father), rather than complete those reintegration tasks. Yet Father contends KVC should have discovered Mother's dishonesty sooner and addressed her substance use problem more aggressively. His argument stretches the bounds of reason. Reasonable efforts help and support families in achieving specific goals for reintegration. It is simply not reasonable or practical for an agency to devote time, energy, and resources to detect false representations and fabrication of evidence by parents who subvert the very process meant to protect the safety and welfare of children.

Considering the evidence in the light most favorable to the State, we conclude a rational fact-finder could have found it highly probable that Father was unfit under K.S.A. 38-2269(b)(7) after the family failed to reunify despite reasonable efforts made by appropriate public or private agencies.

3. *Lack of effort by the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 38-2269(b)(8)*

Father next argues he changed his circumstances to meet his children's needs, and the district court ignored the progress he has made in finding him unfit under K.S.A. 38-2269(b)(8). He points to two circumstances that have changed since the start of the CINC case: the parents moving from an Extended Stay motel to a home in Missouri and the parents beginning to address Mother's substance use problem in therapy. On direct appeal, Father also referenced his stable, long-term employment with the United States Postal Service and reliable transportation as positive factors that *did not need to change* to meet the needs of his children.

The district court noted the biggest change in circumstance was the parents moving from a motel in Kansas to a home in Raytown, Missouri. But the court found the decision to move to Missouri created complications and added another obstacle to family

reintegration because "now the parents must have an approved ICPC for the children to return to their home. After the first ICPC was denied, due to the parents failing to complete the required paperwork, the parents made no adjustment to their circumstances and remained in Missouri." The court then pointed to evidence showing "that the second ICPC was denied because the parents are involved in the Missouri equivalent of a [CINC] case for [B.G.]" who has been removed and is in DCF custody. Ultimately, the court concluded "the children cannot return to their parents' Missouri home at this time, and it is unknown when that circumstance will change." Thus, the district court duly considered the parents' housing circumstances but found the cited "change" had not altered the relevant issue of allowing the children to live with the parents.

Father's other claim that "the family was beginning to work on the mother's drug use" in effort to adjust circumstances to meet the needs of the children is unsupported by the record. At the time of the termination proceeding, Father was taking part in counseling individually and with Mother. Their purported "breakthrough" in therapy related to her substance use was Mother agreeing to tell Father when she has an upcoming drug test. While this may constitute an improvement in the parents' communication, we do not see a connection between this improved communication and the requirement Mother abstain from using illegal drugs, particularly in light of the evidence presented. Mother testified any positive drug tests for methamphetamine and amphetamine were the result of taking valid, unprescribed medications but provided no admissible evidence to support this assertion. The parents' therapist testified Mother did not acknowledge using illegal drugs and Father supported her excuses for the positive drug test results. As a result of "Mother's startling patterns of deception and [dis]honesty," the district court found Mother had "little to no credibility" on the issue of her substance abuse. As stated above, we do not reweigh the evidence presented or assess the credibility of witnesses at the hearing.

13

Considering the evidence in the light most favorable to the State, we conclude a rational fact-finder could have found it highly probable Father was unfit under K.S.A. 38-2269(b)(8) based on Father's lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of his children.

4. *Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home, K.S.A. 38-2269(c)(3)*

Finally, Father asserts that, contrary to the district court's finding otherwise, he successfully completed his reintegration plan. He listed owning a home in Missouri, having a driver's license, car insurance and registration, and consistently participating in visits as tasks he completed successfully. Father's actual progress on the reintegration plan is difficult to assess because he failed to include in the appellate record a copy of his case plan outlining specific goals, tasks, and timelines for reintegration or any documentation verifying his compliance with plan tasks. From the record, however, we can infer Father's case plan required stable employment, reliable transportation, consistent visitation, suitable housing, and completion of a parenting class to achieve reintegration.

There was evidence Father completed some reintegration tasks, which the district court considered. It was undisputed he maintained stable employment and faithfully participated in visitation. But with respect to suitable housing for the children, the parents failed to complete the ICPC process, and once state agencies discovered Mother had falsified drug tests, parenting classes, and substance abuse treatment, it was not clear when or if the process would be restarted. There is no reliable evidence Father completed the required parenting class because the proof of completion submitted to KVC was falsified. The record shows parents had ample time—indeed a generous amount of extra time—to accomplish these important tasks but due to their own actions or omissions, they failed to do so.

It was also undisputed, including by Mother's testimony, that over the entire case, Father only minimally communicated with KVC and was not engaged with the reintegration tasks other than participating in visitation. Instead, he relied on Mother to be the sole point of contact with the assisting agencies, and the parents treated her reintegration plan as the "de facto" plan for both parents. As a result, the court concluded Father "has chosen to let mother handle everything with KVC, including providing proof that these plan tasks are completed." Father's lack of engagement in the reintegration process is especially troubling given Mother's repeated incarcerations during the pendency of this case and her documented history of illegal drug use and dishonesty with family service agencies.

This brings us to an observation that an implicit, critical requirement for reintegration is that the parents show a sustainable childcare plan. Here, the only option the parents provided to the court was Mother would be the children's primary caregiver while Father worked very long hours. But the parents failed to show Mother would be *a reliable and safe* primary caregiver capable of meeting the four children's physical, mental, and emotional needs. Quite the opposite.

Mother was repeatedly incarcerated during the pendency of this case; in fact, she was arrested in the same week as the termination proceeding and charged with two felony crimes. The district court found Mother continues to be "involved in criminal activity" which "puts her at risk of being incarcerated and unable to care for the children." She also missed mandatory UAs and tested positive for methamphetamines and amphetamines multiple times during the case, then submitted falsified drug test results. At the termination hearing, Mother insisted her positive drug tests resulted from taking valid medications but did not provide any documentation of valid prescriptions or other admissible evidence to support this claim. Consequently, the district court found "Mother continues to have issues related to her substance abuse and has taken no steps to begin

treatment and recovery after all of this time and despite a pattern and years of drug use dating back to 2013." For his part, Father denies knowing throughout this case that Mother was using illegal drugs. But his claimed ignorance about Mother's substance use problem does not relieve him of the requirement to show a sustainable childcare plan for reintegration, which he failed to do.

Ultimately, the district court found the parents "had 40 months to complete their reintegration plan" but failed to do so—instead, they submitted "falsified documents and false information . . . meant to mislead and deceive the public and private agencies in this case." As to Father specifically, the court reasonably concluded he was either "aware of [M]other's actions and behaviors and has done nothing to correct the false statements and information" or is "so unengaged that he makes no effort to ensure that documentation and information submitted by mother on his behalf to KVC is accurate and truthful."

Considering the evidence in the light most favorable to the State, we conclude a rational fact-finder could have found it highly probable that Father was unfit under K.S.A. 38-2269(c)(3) based on Father's failure to carry out a reasonable plan approved by the court directed toward integration of his children into his home.

B. *Conduct or condition of unfitness unlikely to change in foreseeable future*

After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). "The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them." *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711

16

(2014). "A district court may look to a parent's past conduct as an indicator of future behavior" and give weight to actions over intentions. *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018); *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

There is no set amount of time in which a parent's failed completion of the reintegration plan proves the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. But Kansas caselaw suggests such a finding is warranted when the time for completion has been extended, the parent makes little progress towards reintegration during that added time, and reintegration is still not possible or expected in the near future. See, e.g., *In re R.S.*, 50 Kan. App. 2d 1105, 1116-17, 336 P.3d 903 (2014) (mother's unfitness unlikely to change in the foreseeable future after 10 months had passed and she had made only minimal efforts to regain custody); *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001) (possibility that children would remain in out-of-home-placement for at least 30 months before mother would be released from jail and reintegration could proceed supported a finding that the circumstances of unfitness were unlikely to change in the foreseeable future). That is exactly what happened here.

The district court found Father's unfitness was unlikely to change in the foreseeable future on the basis of the following:

- "The children have been out of [F]ather's care for the past 40 months."

- "There have been significant efforts by both public and private agencies in both Kansas and Missouri over the past 40 months to rehabilitate [F]ather and this family."

- "Father is essentially in the same place he was when the cases were filed in 2019."

17

- "Father made the intentional choice to move to Missouri while his children are in Kansas DCF custody, and no information has been submitted that this is going to change."

- "[T]he children cannot reside in [Father's] Missouri home" due to rejected ICPCs.

- Child (B.G.) in Missouri has been removed twice from Father's care.

- There is no indication Father "is likely to comp[l]ete the reintegration plan in the foreseeable future."

In his Petition for Review, Father repeats his argument that the district court "ignores the clear progress the father . . . made in the case," as outlined in his challenge of the court's unfitness finding. On direct appeal, Father argued the court improperly drew inferences or made "inappropriate, hypothetical leaps" to find his unfitness was unlikely to change in the foreseeable future. He asserted any current unfitness "was changing and was likely to continue to change very quickly" based on evidence at the hearing. He cited having a house and a job, participating in visitation that reportedly went well, and the parents' recent "breakthrough" in therapy. He also pointed to the parents' therapist's testimony that reintegration remained a goal in the Missouri case involving B.G.

As discussed, the district court considered this evidence in the context of the unfitness factors, and we do not reweigh evidence on appeal. The district court properly considered the foreseeable future element from the perspective of the children and looked to Father's past conduct as a reliable indicator of how he would behave in the future. The court noted C.A., D.G. Jr., and U.G. were out of Father's care for 40 months, and Di.G. for 22 months, which constituted most of the children's lives up to that point. This long time span was attributable to the multiple extensions parents received to continue

working towards reintegration. Yet by the time of the termination proceeding, the family was no closer to reintegration due to: Mother's substance abuse, incarcerations, and dishonesty with assisting agencies; Father's lack of engagement in the reintegration plan and unwillingness to communicate with those agencies; the parents' failure to complete an appropriate parenting class; and the housing situation that the parents created by moving to Missouri and the subsequent failed ICPC process. Given this evidence, the court concluded reintegration was not a reasonable possibility and there was no indication it would be in the foreseeable future, stating "after 40 months, the parents are still having supervised visitation with the children, and there is no information before the Court to support a finding that unsupervised parenting time will resume in the near future."

Considering the evidence in the light most favorable to the State, we conclude a rational fact-finder could have found it highly probable that Father's conduct or condition of unfitness was unlikely to change in the foreseeable future under K.S.A. 38-2269(a).

## II.   *K.S.A. 38-2269(g)(1):  best interests of the child*

In addition to findings of unfitness, the court must consider whether it is in the best interests of the child to terminate parental rights. K.S.A. 38-2269(g)(1) expressly identifies the physical, mental, and emotional health of the child as the primary factors a district court should consider in making its best-interests determination. See K.S.A. 38-2269(g)(1) ("If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order."). In assessing the child's physical, mental, and emotional health, the court may make a series of factual determinations. These factual findings may include, but are not limited to, personal features of the child's relationship with the parent and the harm that would come from losing the relationship and attachment, how a prospective adoptive placement for the particular child may work to counterbalance those harms, whether guardianship would

19

better meet the physical, mental, or emotional needs of the child, and how the prospects for achieving permanency for the child will impact the child in terms of placement stability, placement disruptions, and aging out of the system.

Unlike subsection (a)—which expressly requires a "clear and convincing evidence" standard of proof for parental unfitness findings—subsection (g)(1) does not provide a standard of proof for factual findings regarding the child's physical, mental, and emotional health, which are the primary statutory factors the district court should consider in deciding whether the child would be best served by termination of parental rights. In *In re R.S.*, a panel of the Court of Appeals resolved an inconsistency within that court "about whether we should review the best-interests determination under an abuse-of-discretion standard or under the clear-and-convincing-evidence standard." 50 Kan. App. 2d at 1113. The panel ultimately held Kansas appellate courts should review the best-interests determination for abuse of discretion, which occurs when no reasonable person would agree with the district court or the court's decision is based on a legal or factual error. In determining whether the district court made a factual error, the panel held any factual findings about the child's physical, mental, and emotional health that were made in the best-interests determination should be reviewed to see that substantial evidence supports them, specifically recognizing that the preponderance-of-the-evidence standard of proof applies to best-interests findings in the district court. 50 Kan. App. 2d at 1116.

The Court of Appeals has cited to the *In re R.S.* standard of review in hundreds of cases since 2014. And consistent with these cases, Father argued both on appeal and in his petition for review that the district court abused its discretion under this standard of review in deciding termination of his parental rights was in the best interests of his children. Even so, this court has yet to decide whether the lower preponderance-of-the-evidence or the higher clear-and-convincing standard of proof applies to factual findings

20

made under subsection (g)(1) and, depending on the answer, the impact this might have on our standard of review. But we need not decide at this time whether the higher standard of proof should apply under subsection (g)(1) because the district court here found under the higher standard—clear and convincing evidence—that the best interests of the children will be served by termination of both parents' rights.

"The Court has given primary consideration to the physical, mental and emotional health of these children. Permanency for [C.A., D.G. Jr., and U.G.] has not been achieved in the more than three years that these cases have been impending. Permanency for [Di.G.] has not been achieved in the 22 months since her birth.

"As stated by the children['s] Guardian Ad Litem, this Court finds that the children deserve permanency. And right now, they are all waiting on a shelf for their parents to bring them home.

"The Court has considered that the current placement where all four children reside together is a willing, adoptive resource for the children.

"This is a heartbreaking case. And without question, both parents love the children. The Court has considered the testimony of Ms. Johnson, the therapist for [C.A.] and [D.G. Jr.], and that these children need a structured and consistent routine and a permanent and consistent home. Ms. Johnson testified that in working with Placement, that she believes Placement can provide to the children what they need for their physical, mental and emotional health.

"The evidence presented raises considerable concern by the Court that mother is unable to address her own substance abuse and behavioral issues, so how will she also provide the children what they need for their physical, mental and emotional health.

"And that father will be unable to provide the structure and consistency the children need, and will leave the parenting to mother, as evidenced by the past history of the parties and mother's testimony that she is the parent to primarily care for the children in their household.

"The evidence also reveals that the children are bonded with Placement. And after 40 months, [U.G.] and [Di.G.] have lived with and been cared for by Placement for the entirety of their lives.

"When considering all evidence presented during this trial, the Court finds that the best interest of these children are served by the termination of both parents' rights."

Father asserts in his Petition for Review that there was no credible evidence presented at the hearing that it was in the children's best interests to terminate his parental rights. He points to evidence he cared for the children when they were younger, before the CINC proceedings began, and he attended all visitations, including when Mother was incarcerated for months at a time. At visits, he was engaged with his children and they enjoyed being around him. Based on this evidence, Father argues the children's best interests would not be served by terminating his parental rights. Instead, he asserts, "the best course of action considering the physical, mental, or emotional needs of the children was to give the father more time to reintegrate with his children."

Regardless of the standard of proof required, we do not reweigh conflicting evidence in a sufficiency review. Yet we agree with the district court that there was clear and convincing evidence presented here that the children's physical, mental, and emotional needs could best be served by termination. Thus, we conclude a rational fact-finder could have found it highly probable—i.e., by clear and convincing evidence—that termination of Father's parental rights was in the children's best interest. As such, we find no factual error within the district court's best-interests determination.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.