NOT DESIGNATED FOR PUBLICATION

No. 128,514

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of W.M.,
a Minor Child

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed July 25, 2025. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant.

*Sarah Ikena*, assistant county attorney, for appellee.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM: The district court terminated Mother's parental rights to W.M. (born in 2007), citing four statutory factors for determining unfitness. Mother appeals, arguing that the record lacks clear and convincing evidence that she is unfit and that her conduct is unlikely to change in the foreseeable future, as the law requires for termination. Mother also claims that termination was not in her son's best interests. After reviewing the record, we find Mother's arguments unpersuasive and affirm the district court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2022, the Department for Children and Families (DCF) received a report regarding W.M., indicating that he needed foster care services. W.M.'s paternal grandfather (Grandfather), made the report. In short, Grandfather reported that W.M. had

1

been living with him since November 2021 but he wanted W.M. removed from his home and placed in someone else's care.

*Details Surrounding Request for DCF Intervention*

Grandfather explained in his report to DCF that W.M.'s mother had been arrested and jailed for fighting in November 2021. W.M., who was 14 years old at the time, was left alone in an unsafe home for two days and was later removed from Mother's home. Father lived separately from Mother and was initially considered as an alternative placement for W.M. But Father contacted Grandfather and asked if W.M. could live with him because Father's roommate would not allow W.M. to live in their home. Father promised to find suitable housing for W.M. and himself but asked Grandfather to care for W.M. in the meantime. Grandfather agreed and received durable power of attorney over W.M. But as time passed, Father and Grandfather argued about the structure that W.M. needed in his life. Grandfather also alleged that while W.M. lived with him, Father did not parent W.M. or provide any financial assistance. Grandfather also felt that W.M. and Father were disrespectful and unappreciative. As of August 2022, Father still had not secured suitable housing for W.M. So Grandfather decided that W.M. was no longer allowed to stay with him and told DCF that he wanted him removed from his home immediately.

After receiving the report, DCF contacted each family member about W.M.'s potential placement options. Mother explained that she lived in a one-bedroom apartment in Sedalia, Missouri, and did not have suitable housing for him but she would find another place to live. W.M. stated that he wanted to live with Father, in part because he believed that Father's health was failing. Father stated that he was still looking for a suitable home and was also trying to obtain disability payments. Grandfather suggested that it would be in W.M.'s best interests to be placed in foster care.

2

*Initiation of Court Proceedings*

On September 28, 2022, the State petitioned the district court to find that W.M. was a child in need of care. The State alleged that Grandfather was unable to continue to care for W.M., that Mother and Father had not cared for W.M. for the previous 10 months, and that neither parent had changed their circumstances to meet W.M.'s basic needs.

In a supporting affidavit, the State listed the history of DCF's involvement with the family. The affidavit referenced:

- reported domestic violence between Mother and Father and Mother and her boyfriend;
- a previous truancy case for W.M.;
- three neglect or abuse cases initiated on W.M.'s behalf;
- W.M.'s lack of basic resources;
- that Mother's boyfriend had once scratched W.M.'s face; and
- that Mother had neglected W.M. in November 2021.

The district court removed W.M. from his placement with Grandfather and ordered custody and placement with DCF. On October 5, W.M. began living with a married couple as a foster placement.

The district court held first appearance and status hearings in October and November 2022. Father appeared at these hearings through counsel. Mother did not appear in person or through counsel. Following these hearings, the district court ordered custody of W.M. to remain with DCF.

3

*Adjudication and Termination Proceedings*

The district court held an adjudication and disposition hearing for Father on December 28, 2022. The service of notice of this hearing to Mother failed, and she did not appear. At the hearing, a case worker provided a new address for Mother. After the hearing, the district court adjudicated W.M. as a child in need of care and scheduled a review hearing for March 21, 2023. The district court also scheduled an adjudication and disposition hearing for Mother for the same day.

In January 2023, Cornerstones of Care filed reintegration plans for Mother and Father. The district court adopted the reintegration plan as to Father in January 2023. Mother's reintegration plan would be adopted later, on July 11.

As did the previous attempt to serve Mother, service of notice to Mother for the March hearing failed. So the State moved for notice by publication. The district court granted the motion, ordered a continuance, and appointed Mother counsel. On June 26, 2023, the State filed a proof of service to Mother, and the district court then scheduled a permanency hearing for Mother on August 29.

Mother appeared in person and through counsel at the hearing. Father appeared through counsel. The district court found that reintegration was still a viable goal for Mother but not Father.

The State moved for findings of unfitness and to terminate Mother's and Father's parental rights on September 13, 2023. The district court considered the motion as to Father in November. Father appeared through counsel who stated that Father's health prevented him from parenting W.M. After considering the State's evidence, the district court found Father unfit and terminated his parental rights to W.M. The district court

continued the proceedings related to Mother for the presentation of evidence on January 10, 2024.

*Termination Hearing on Motion to Terminate Mother's Parental Rights*

The State presented testimony from three witnesses, including Mother and case workers Jerica Thorne and Victoria Ruebhausen. Thorne and Ruebhausen worked for Cornerstones of Care and were the last two of four case workers assigned to this case. Thorne was the case manager for two and a half months, from June to August 2023, and Ruebhausen took over in September 2023.

Mother's primary contention at the hearing was that she had not received adequate notice of the district court proceedings. She admitted knowing that W.M. had been taken to live with Grandfather in November 2021, and that Rickey Giles, a DCF employee, had called her on September 28, 2022, to tell her that W.M. was being taken into DCF custody that day. Giles also told Mother that he would not be working on W.M.'s case after their initial discussion and instructed her to contact Cornerstones of Care going forward. Mother admitted knowing that Grandfather was considering contacting DCF for assistance about a month before he made the call.

Despite all this, Mother maintained that she did not know that any court proceedings about W.M.'s custody were being held until around four to six months before the termination hearing. She claimed that she first learned that reintegration was still a possibility when she received notice of the August 2023 hearing. Until then, she believed that her parental rights had been terminated when W.M. was first placed in DCF's custody. She also testified that she may have been busy with other matters when some district court proceedings occurred. She explained that she had lived with an abusive ex-boyfriend from 2010 to 2021 and had to leave that relationship and relocate.

5

Mother also admitted that during the eight-month period that she knew that W.M. was in DCF custody, she had little or no contact with him and had not provided him any financial support. When W.M. lived with Grandfather, she visited in person a few times and talked to W.M. over the phone at least a couple of times each month. But Mother agreed that she had not offered or provided any financial assistance to W.M. throughout that time.

As for her knowledge about her reintegration tasks, Mother conceded that she received the reintegration plan and understood the tasks that she needed to complete. She summarized the important tasks as requiring her to obtain employment and housing and complete a mental health evaluation and parenting classes. She also needed to "demonstrate what [she] learned during visitation." But Mother again stated that she received the plan around only four months before the termination hearing, and she did not recall having any significant discussions regarding reintegration with Thorne.

Thorne and Ruebhausen testified that Mother completed none of her reintegration tasks. These tasks required Mother to:

- Obtain and verify suitable housing and legal income;
- remain in contact with Cornerstones of Care;
- sign all releases of information;
- complete an initial assessment;
- obtain a mental health assessment and follow the recommendations;
- obtain reliable transportation and provide proof of insurance and registration;
- participate in family therapy;
- complete and verify parenting classes; and
- maintain a consistent visitation schedule.

6

Mother testified that she was living in a suitable home for W.M. and had partially completed some parenting classes. Yet Mother tacitly conceded that she did not complete any of these tasks.

Regarding housing, Mother explained that around a year earlier, she had moved to her aunt's house, where her father also lived, in Warrensburg, Missouri, and she served as a caregiver for her aunt. She testified that the house had multiple bedrooms and space for W.M. She acknowledged that she had not given Cornerstones of Care any verification of this residence, but alleged that no one had asked her to submit such documentation. Instead, Mother testified that Ruebhausen simply stated that she needed to have background checks completed for anyone living in the home, and Mother inquired about how to do so about a month before the termination hearing. But Ruebhausen testified that she asked Mother for verification of the residence, as Mother's reintegration plan requires.

Regarding income and employment, Mother testified that she did not have verification that she was her aunt's caregiver. She did not have any other form of employment or income. She had recently attended two job interviews and received a job offer from one potential employer, but she declined it, claiming if she worked in the area where the job was, she may be tempted to return to her abusive ex-boyfriend.

As for her work history, Mother testified that when W.M. first went to live with Grandfather, she worked full-time for the Internal Revenue Service. She made around $40,000 per year and had held that position for about 15 years, but she lost that job in 2022. She held a job at a fast-food restaurant for a short time after that but was fired because she missed too much work. During that time, W.M. was required to attend school at home during the COVID-19 pandemic and this caused her to miss work.

Mother also admitted that she did not have a disability or other circumstance that would prevent her from returning to work. She was having a hard time finding a job but believed that she eventually would. But after moving in with her aunt, who supported her financially, she did not feel that she needed to secure another job.

Mother admitted that she did not have a valid driver's license. Nor had she completed a mental health assessment—she was hesitant to start that process. She had, however, obtained health insurance as an initial step to completing a mental health assessment. She testified that she had made several attempts to contact one of her caseworkers, presumably Thorne, but her voicemailbox was always full, so Mother was unable to leave any messages. Mother also purchased four hours of parenting classes. But after she started reading the material, she felt "defeated" and thus never completed those classes. Yet Ruebhausen had told Mother that she needed to complete 12 hours of classes.

Thorne and Ruebhausen testified that W.M. consistently refused to have in-person contact with Mother. W.M. told Thorne and Mother in July that he did not want to allow visitation and instead wanted to be adopted by his foster parents. After some discussion, W.M. agreed to participate in phone calls with Mother. Cornerstones of Care did not receive any reports of problems related to these visits. But Cornerstones of Care never set up other forms of visitation because W.M. refused any other form of communication with Mother, stating that he did not feel safe with Mother. And W.M. had stated that even if an in-person visit was scheduled, he would refuse to get into the car to attend the visit.

For similar reasons, Cornerstones of Care decided not to pursue family therapy for W.M. and Mother. Mother testified that she was interested in participating in family therapy, which was one of Mother's reintegration tasks. W.M. participated in individual therapy but told Thorne and Ruebhausen that he did not want to attend therapy with Mother. He instead wanted Mother to relinquish her parental rights so he could be adopted. Thorne requested a recommendation from W.M.'s therapist as to whether family

therapy would be beneficial, but she did not receive a response before she transferred W.M.'s case to Ruebhausen.

Ruebhausen never received verification on the issue. Ruebhausen decided not to pursue family therapy for W.M. and Mother because W.M. eventually decided that he wanted zero contact with Mother. W.M. made this decision after he received certain emails from Mother. In one of these emails, which W.M. received on December 9, Mother stated:

> "'I've thought about it. You denied me visitations out of the gate. Not [c]ool. I've changed my mind. I was [going to] let you go, let you be with these people, but not now. You're my son, no one else's. So I will be seeing you soon. I love you, son, remember that.'"

W.M. told Ruebhausen that this email scared him because he feared that he would be sent to live with Mother again.

Thorne and Ruebhausen testified that W.M.'s current placement was a potentially permanent adoption placement. W.M.'s foster parents confirmed in a letter to the district court that they were willing to pursue adoption. And W.M. wanted to pursue this. Ruebhausen also testified that she believed adoption would be in W.M.'s best interests.

In closing arguments, the State emphasized that Mother had not provided proof of suitable housing or income and had no in-person contact with W.M. since the initiation of this case. The State argued that termination was appropriate based on several statutory factors and was in W.M.'s best interests. W.M.'s appointed guardian ad litem agreed, arguing Mother had not cared for W.M. for over two years and showed no serious participation in reintegration efforts. The guardian ad litem also noted that W.M. would turn 18 years old in a year and a half. Given this and the remaining evidence, the guardian ad litem argued that it was unlikely that Mother's circumstances would change

in the foreseeable future. The guardian ad litem thus agreed that termination was in W.M.'s best interests.

In Mother's closing argument, she argued that she had been given only around eight months to complete her reintegration plan and that she had made sufficient efforts toward reintegration under the circumstances. She emphasized that she had suitable housing for W.M. and had lost her most recent job for reasons related to the COVID-19 pandemic. She also argued that she had been denied a reasonable opportunity to maintain visitation with W.M. Mother also claimed that Ruebhausen had maintained communication with her, but the other case managers had not.

The district court took the matter under advisement and announced its ruling at a separate Zoom hearing. The district court made several credibility findings. It found Thorne's and Ruebhausen's testimonies credible and adopted them in their entirety. The district court found Mother's testimony credible about her residence with her aunt in Missouri but found most of Mother's remaining testimony not credible. The district court rejected Mother's claim that she did not receive any assistance from appropriate agencies until around four months before the termination hearing. The district court also made a negative credibility finding against Mother's claim that she had been interviewed for and offered a position but had turned it down. The district court also rejected Mother's allegation that she had not participated in any of the initial proceedings because she believed that her parental rights had been terminated at the beginning of this case:

> "Her testimony was that she effectively thought she didn't have a chance to reintegrate, and that . . . she thought that . . . her rights were immediately terminated [when W.M. was placed in DCF custody] and . . . she just wasn't going to be able to engage in the reintegration process. Again, I did not find that portion of her testimony to be . . . credible. She herself testified about how she had been in State's care and . . . acknowledged that she knew that he was coming into care on September 28th of 2022[.]

10

. . . [T]here's no evidence or no reason for her . . . to think that there was just absolutely no ability to reintegrate, and I did not find that portion of her testimony to be credible."

Ultimately, the district court found that Mother was presently unfit to parent W.M. based on these statutory factors of unfitness:

- K.S.A. 38-2269(b)(4): Mother neglected W.M. throughout this case;
- K.S.A. 38-2269(b)(7): Public and private agencies made a reasonable effort to rehabilitate the family and failed;
- K.S.A. 38-2269(b)(8): Mother did not make reasonable efforts to adjust her circumstances, conduct, or conditions to meet W.M.'s needs; and
- K.S.A. 38-2269(c)(3): Mother failed to carry out a reasonable case plan.

But the district court declined the State's request to find Mother unfit under K.S.A. 38-2269(c)(2)—failure to maintain visitation—or K.S.A. 38-2269(c)(4)—failure to pay a reasonable portion of the cost of substitute physical care based on ability to pay.

The district court also found that Mother's unfitness was unlikely to change in the foreseeable future, noting Mother's inaction throughout the initial proceedings and her failure to complete her reintegration tasks.

Lastly, the district court determined that termination was in W.M.'s best interests. The district court noted W.M.'s desire to pursue adoption and sever any in-person contact with Mother, but it did not rely solely on those preferences in making its decision. Instead, the district court found that the time that W.M. was in custody, Mother's lack of progress toward reintegration, and the stability of W.M.'s placement had supported the conclusion that termination was in W.M.'s best interests.

Mother appealed the district court's decision. The State then moved to dismiss Mother's appeal, arguing Mother did not file a timely docketing statement. But we granted Mother's motion to docket her appeal out of time. Father is not a party to this appeal.

## THE DISTRICT COURT DID NOT ERR IN FINDING MOTHER UNFIT OR ABUSE ITS DISCRETION BY TERMINATING MOTHER'S PARENTAL RIGHTS

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Before a parent can be deprived of this right, the parent is entitled to due process of law. But this fundamental right to parent is not without limits. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). Because child welfare is a matter of state concern, the State may intervene "through . . . processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

When, as here, a child has been adjudicated to be a child in need of care, the district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). "'The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them.' [Citation omitted.]" *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024).

K.S.A. 38-2269(b) lists nine nonexclusive factors the district court shall consider in determining unfitness. The district court must also consider four other nonexclusive

12

factors when a child is not in the parent's physical custody. K.S.A. 38-2269(c). Any one of the factors in K.S.A. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(f). The district court may also rely on 1 or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 38-2271(a).

After a court finds a parent unfit, the court must then consider whether termination of parental rights is in the best interests of the child. K.S.A. 38-2269(g)(1). In making this determination, the court must give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would best be served by termination, the court must so order. K.S.A. 38-2269(g)(1).

On appeal, we must be convinced, after reviewing all the evidence in the light most favorable to the prevailing party, that the district court's fact-findings are highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

*Unfitness*

Although the district court found Mother unfit under four statutory factors, we review only two of them.

> *K.S.A. 38-2269(b)(7)—Failure of reasonable agency efforts to rehabilitate the family*

K.S.A. 38-2269(b)(7) states the court shall consider "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." Mother contends that Cornerstones of Care's efforts to assist her in completing her reintegration

13

plan were not reasonable. She contends Thorne and prior case managers failed to make reasonable efforts to contact her and suggests that because several case workers were assigned to her case over about six months, employee turnover rates must have been high. Mother agrees that communication with Cornerstones of Care improved when Ruebhausen took over as her case manager. Mother does not specify what more she thinks the agency should have done.

Although the testimony showed that Cornerstones of Care could have done more to rehabilitate Mother and W.M. as a family, that is usually the case and is not the standard by which we judge reasonableness. The district court credited Thorne's and Ruebhausen's testimonies, and we cannot revisit that credibility finding. Thorne and Ruebhausen testified that each had sent Mother her reintegration plan several times, starting in July 2023, and had confirmed Mother's email address before doing so. Thorne met Mother in person on July 11 and sent her the reintegration plan that day, as well as again on August 15. Thorne tried to contact Mother over the phone several times without success.

Thorne and Ruebhausen later together met with Mother in August as a part of a "warm transfer" of this case to Ruebhausen. Mother gave Ruebhausen an updated phone number and email address during the meeting. And after the meeting, on September 1, Ruebhausen texted Mother to reintroduce herself. Ruebhausen texted Mother several times after that. Mother responded to some of these messages but ignored several others. Ruebhausen testified that as the case progressed, Mother continuously failed to complete any of her reintegration tasks, so she repeatedly sent Mother the reintegration plan. In total, Ruebhausen sent Mother the reintegration plan around 15 times.

Thorne and Ruebhausen thus made several attempts to contact Mother to ensure Mother knew the tasks that she needed to complete for reintegration. Mother did not respond to several of these attempts. Mother also admitted that she had received a call

14

from Giles early on. Per his instructions during that call, Mother knew that she needed to contact Cornerstones of Care to participate in this case.

Clear and convincing evidence shows the case managers' efforts were reasonable under the circumstances. The evidence supports the district court's finding that reasonable efforts by appropriate agencies to rehabilitate the family had failed.

*K.S.A. 38-2269(c)(3)—Failure to carry out a reasonable reintegration plan*

The second basis for the district court's finding of unfitness that we address is that Mother failed to "carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home" under K.S.A. 38-2269(c)(3). It is undisputed that W.M. has been in out-of-home placement since November 2021 and in DCF custody since September 2022. The parties made diligent efforts to notify Mother of these proceedings. When Mother finally responded, the district court approved a reintegration plan in July 2023, which required her to complete basic reintegration tasks. Several case managers attempted to contact Mother and help her complete her reintegration tasks over the course of several months. But as of the termination hearing in January 2024, Mother had not completed any of her reintegration tasks.

Mother concedes that she did not complete her reintegration plan but challenges the reasonableness of the plan based on the time that she was given to complete the tasks. She also notes that she made at least some progress toward completing portions of certain tasks.

But the record shows that Mother made only minimal efforts toward reintegration. True, she testified that she obtained housing by moving in with her aunt and working as her caregiver. But Mother never verified her residence or any income or employment, as the reintegration plan that she repeatedly received requires. She enrolled in an insurance

15

program as an initial step to completing a mental health assessment, yet she never completed a mental health assessment. She paid for some parenting classes, yet she never completed even one parenting class. She did not possess a valid driver's license.

We do not fault Mother here for not meeting the plan requirements of participating in family therapy or maintaining a consistent visitation schedule. Mother was willing to do both of these tasks, but W.M. mostly refused visitation and communication with her, and declined family therapy.

Having reviewed the record, we find clear and convincing evidence supporting the district court's finding that Mother was unfit under K.S.A. 38-2269(c)(3) because she failed to carry out a reasonable case plan.

*Foreseeable Change in Unfitness*

Next we ask whether the State proved that Mother's circumstances are "unlikely to change in the foreseeable future." See K.S.A. 38-2269(a). After the termination hearing, the district court found that Mother made at least some effort during the few months leading up to the termination hearing by responding to several of Ruebhausen's texts. Mother also sent W.M. several emails and made other efforts to maintain contact with W.M. But Mother made no efforts toward reintegration or to maintain contact with W.M. during the initial proceedings in the district court. She also consistently left every portion of her reintegration tasks uncompleted throughout these proceedings.

Mother cites *In re K.R.*, 43 Kan. App. 2d 891, 233 P.3d 746 (2010) and argues that the record simply lacks sufficient evidence supporting this crucial element of the district court's decision. But Mother does not explain her reason for referencing *In re K.R.*, and we find that case factually distinguishable. The most notable distinction is that the mother's therapist in *In re K.R.* testified that the mother had the potential to become a

16

good parent. The therapist also opined that the mother could conceivably reach that potential within six months. 43 Kan. App. 2d at 902.

Here, the evidence showed that, at best, Mother made minimal or less than minimal efforts toward reintegration by the time of the termination hearing. We agree that clear and convincing evidence shows that Mother's conduct was unlikely to change in the foreseeable future. Cf. *In re S.L.S.*, No. 127,604, 2025 WL 1202252, at *8 (Kan. App. 2025) (unpublished opinion) (similarly finding "minimal efforts" supported foreseeability finding where the mother completed some inpatient addiction treatment, a parenting class, and secured employment and housing but did not provide proof of these tasks and failed to complete other tasks, including maintaining sobriety).

*Best Interests*

Finally, the district court determined that termination of Mother's parental rights was in W.M.'s best interests under K.S.A. 38-2269(g)(1). "While a court's unfitness finding must be supported by clear and convincing evidence, the best-interests determination depends on a preponderance of the evidence." *In re E.L.*, 61 Kan. App. 2d 311, 330, 502 P.3d 1049 (2021). But see *In re D.G.*, 319 Kan. at 463 (declining to decide whether clear and convincing standard or preponderance standard applies to best interests finding). The district court is in the best position to make findings on the best interests of the child. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). We thus review the best-interests determination for abuse of discretion. The district court abuses its discretion if no reasonable person would agree with the court or the court made a factual or legal error. *In re E.L.*, 61 Kan. App. 2d at 330.

Mother argues that finding termination to be in W.M.'s best interest is an abuse of discretion because she "objectively demonstrated a strong desire to regain custody of her child." She also claims that "[w]hen a parent undertakes . . . significant ongoing efforts

and involvement[,] . . . the best interests of the child are served by reintegration with that parent and maintaining an intact family structure." But the record summarized above shows that Mother's efforts and involvement were neither significant nor ongoing.

As for Mother's stated desire, a "parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing. . . . [W]e must judge these cases based mostly upon actions, not intentions." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). This court found in *In re K.R.*, 43 Kan. App. 2d at 904, that courts

> "must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children."

And regardless of Mother's intentions, the district court had wide discretion in determining how W.M.'s interests would be best served under the circumstances. Mother shows no abuse of that discretion. W.M. had been in DCF custody since September 28, 2022. He maintained stability in his placement with his foster family since that time. He initially refused to participate in in-person visits with Mother and eventually asked to end all communications with her. W.M. made consistent requests for Mother's parental rights to be terminated. Thorne and Ruebhausen indicated that W.M.'s foster parents were potential candidates for adopting W.M. And Ruebhausen testified that adoption would be in W.M.'s best interests. W.M.'s foster parents also confirmed that they were willing to adopt W.M. at W.M.'s request and with the court's permission.

The district court found that despite all this, Mother managed to maintain at least some contact with W.M. throughout these proceedings. But Mother did not complete any

of her reintegration tasks so she was far from reintegrating with W.M. By the time of the termination hearing in January 2024, W.M. was 16 years old and was able to understand the circumstances surrounding this case. The district court considered all the evidence and determined that termination of Mother's parental rights was in W.M.'s best interests.

Based on this record, we find no abuse of discretion in the district court's finding that it is in W.M.'s best interests to terminate Mother's parental rights. We thus affirm the district court's order terminating Mother's parental rights.

Affirmed.