NOT DESIGNATED FOR PUBLICATION

Nos. 127,757
127,758
127,759
127,760

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of P.S., C.S., W.S., and R.S., Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed December 13, 2024. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural mother.

*Ashley Hutton*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before MALONE, P.J., BRUNS and CLINE, JJ.

PER CURIAM:  Mother appeals the district court's judgment terminating her parental rights to her minor children, P.S., C.S., W.S., and R.S. (the children). Mother challenges the sufficiency of the evidence supporting the district court's findings that she was unfit to parent under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), (b)(8), (c)(3), and K.S.A. 38-2271(a)(5); that her unfitness was unlikely to change in the foreseeable future; and that the termination of her parental rights was in the best interests of the children. She also claims the district court's finding that Mother was presumptively unfit under K.S.A. 38-2271(a)(5) violated her right to due process because the State's motion to find her unfit and terminate her parental rights did not provide notice of this allegation.

1

After a careful review of the record, we find the district court's mention of the presumption of unfitness under K.S.A. 38-2271(a)(5) in its journal entry was a mistake. Even so, this mistake did not harm Mother because the court did not rely on or apply this presumption when making any of its findings. We also find the district court's findings on unfitness and the best interests of the children are supported by sufficient evidence, so we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 2020, deputies with the Leavenworth County Sheriff's Department arrived at Mother's home in response to a domestic disturbance call from Maternal Grandmother with claims that Father was threatening Mother and was known to be armed with a gun. The children were present in the home at the time. After several minutes of knocking, Mother answered the door. At first, she would not allow the deputies to enter the home and shut the door. When she did open the door, the deputies saw the front room "was completely covered in trash." Crushed beer and soda cans, boxes, rotting food, diapers, and other trash covered every flat surface. The odor emanating from the house was overwhelming, which caused the deputies to feel it was unsafe to enter.

The deputies spoke to Mother, who told them she and Father had verbally argued, but the argument never became physical. During the conversation, Mother had difficulty standing without swaying and one of the deputies noticed the strong odor of alcohol coming from Mother. Mother could name each of her children but could not recall their birthdates. The deputies spoke with Father, who had left the home, on the phone, and explained to him that Mother appeared intoxicated.

Due to Mother's intoxication and the condition of the home, the deputies took the children into protective custody. The children were dirty and lacked proper clothing and

shoes. Based on these factual allegations, the State filed petitions to find the children in need of care on March 30, 2020.

The district court held an adjudication hearing on August 4, 2020, where Mother appeared by Zoom and with counsel. Mother entered a statement of no contest to the child in need of care (CINC) petitions. The district court found that Mother knowingly and voluntarily offered the statement and found the children in need of care.

In a disposition hearing on August 25, 2020, the district court adopted the reintegration plan submitted by Cornerstones of Care and signed by Mother. The district court held a permanency hearing on February 2, 2021, and found that reintegration was still viable. But another permanency hearing was held on May 11, 2021, where the court found that reintegration was no longer viable.

On June 21 and 22, 2021, the State moved the district court to find Mother and Father unfit to parent and to terminate their parental rights to each of the children. The district court heard evidence on the motion on October 27, 2021, where it took the matter under advisement. A disposition hearing was scheduled for November 23, 2021.

On November 12, 2021, before the district court entered its disposition, the guardian ad litem (GAL) moved the court to reopen evidence on the motion to terminate Mother's parental rights. In the new motion, the GAL alleged that on November 4, 2021, Mother was arrested for driving through a homeowner's yard while intoxicated. The district court heard the motion to reopen evidence on December 7, 2021. Rather than reopen the evidence, the district court denied both the motion to reopen evidence and the motion to terminate Mother's parental rights with a finding that the State had failed to prove by clear and convincing evidence that Mother's unfitness was unlikely to change in the foreseeable future.

3

Permanency hearings were held on January 18, 2022, and March 1, 2022. The district court found after the March 1, 2022 hearing that reintegration was no longer viable.

The GAL filed a second motion to find Mother unfit to parent and to terminate her parental rights on January 26, 2022. A termination hearing was scheduled for April 6, 2022, but was continued. The case then underwent several review hearings until the State filed another motion to find Mother unfit to parent and to terminate her parental rights on December 2, 2022.

A bifurcated termination hearing was held on March 22, 2023, and April 19, 2023. The State called several witnesses, the first of whom was Shana Baragary, a dispatcher for the Leavenworth Police Department. Baragary testified that on September 9, 2022, she received a call from Grandmother, who, along with Grandfather, had custody of the children at the time. The children, minus R.S., were staying with Mother that evening, and W.S. had called Father to pick her and the other children up because Mother was intoxicated. Father then called Grandmother and Grandfather, who called the police as they picked up the children.

Austin Allen, an officer with the Leavenworth Police Department, testified next. Allen responded to the September 9, 2022 call with the understanding that Mother was reported to be intoxicated. Upon arriving at Mother's home, Allen eventually contacted Mother, who he noted was "clearly intoxicated." Mother was lethargic, had slurred speech, and had bloodshot eyes. Allen described that Mother was going through "an emotional rollercoaster," where she fluctuated between calm and irate. Mother was particularly upset about the death of a pet, a bearded dragon. Allen advised it was best that the children remained with their grandparents until Mother sobered up. But he declined to perform any field sobriety tests on Mother since she had not been driving or out walking.

The State next called Grandmother. The children had been placed with Grandmother and Grandfather shortly after the children were taken into protective custody in March 2020. After Father had called Grandmother on September 9, 2022, Grandmother called W.S., who cried while describing how she was frightened because Mother and her boyfriend were fighting. R.S. had decided not to participate in the visitation because she "did not like her mother."

When Grandmother and Grandfather arrived, Mother answered the door carrying a dead bearded dragon on her shoulder while W.S. stood next to her crying and shaking. Mother smelled "a lot like alcohol." Grandmother and Grandfather spoke to Mother about her intoxication and at one point the bearded dragon fell off Mother's shoulder without her noticing. Mother told Grandmother that her boyfriend, who was still in the house, needed to be arrested because he hit her and was in possession of methamphetamine. A similar incident had occurred in March 2021, where police were called to Mother's house during visitation because Mother was arguing and intoxicated.

Other times during the pendency of this case, Mother called Grandmother while intoxicated and participated in Zoom calls with the children while intoxicated, and sometimes the children would notice and comment to Grandmother. The main indicators of Mother's intoxication were slurred speech and Mother repeating herself over and over.

Throughout the case, Mother's visitation "ebbed and flowed" between supervised visits up to unsupervised overnight visits. When the children returned from a visit, they were abnormally disobedient and showed signs of stress. As examples, R.S. and W.S. would directly talk to Grandmother about their stresses, C.S. and P.S. would fight, C.S. would get quiet, W.S. would scream in the middle of the night during dreams, P.S. and C.S. would also have bad dreams, and P.S. would talk in his sleep. All the children were in therapy, and R.S. was diagnosed with depression for which she received medication.

5

Grandmother had no concerns with visitation so long as it was supervised but feared the children being alone with Mother due to her long history of intoxication and because she never knew when Mother would be intoxicated or sober. Grandmother testified that the children were also afraid of being alone with Mother.

The State next called Grandfather. Grandfather largely corroborated Grandmother's testimony about the events of September 9, 2022. Grandfather did not fully believe Father when he called about them picking up the children, but he and Grandmother then tried to call W.S., who did not answer. That triggered fears about Mother's history of intoxication and domestic violence. W.S. eventually called back and reported that Mother was fighting with her boyfriend. W.S. was "really shook up." W.S. informed Grandmother and Grandfather that P.S. and C.S. were in the same room with Mother and her boyfriend, so Grandmother and Grandfather asked if she could safely retrieve her siblings and bring them into the bedroom with her. W.S. retrieved C.S. and P.S. without incident.

Grandfather knocked on Mother's door when he arrived and as soon as he saw Mother he could tell that something was not "quite right." Mother slurred her words, acted tipsy, and smelled of alcohol. Grandfather noticed the bearded dragon on Mother's shoulder and questioned her about it. She responded that it had recently died and that was why she and W.S. were upset. Grandfather challenged Mother to breathe into a breathalyzer system installed in her car to prove she was not intoxicated, but Mother refused.

Beyond general knowledge, Grandfather was a credentialed addiction counselor in Missouri who worked in that capacity at Lansing Penitentiary, and at the time of the hearing, he was about a week away from taking his licensing exam in Kansas. Part of his training as an addiction counselor involved detecting when others were under the influence of drugs or alcohol. He did not notice any eye movements showing that Mother

6

was intoxicated, but he repeated that she was slurring her speech and that he knew the "pretty distinct" smell of alcohol. Mother told Grandfather that her boyfriend "'put hands on'" her.

More generally, Grandfather also testified about behavior changes in the children as visitation with their Mother ebbed and flowed. For example, while in Grandmother and Grandfather's custody, P.S. started a behavior where he would constantly clear his throat. The behavior eventually subsided but returned after visits with Mother increased. A doctor examined P.S. and concluded that the behavior was stress induced, as was a patch of eczema on his head. These physical manifestations of stress concerned Grandfather and prompted Grandmother and him to introduce P.S. and C.S., the two youngest, into therapy. W.S. and R.S. had already been in therapy by that time.

Mary Spickelmier, the children's counselor, also testified. Spickelmier diagnosed all four children with PTSD. She saw the children regress multiple times "specifically based around visitation" and felt as though visitation retraumatized them. The regressions came quickly, not gradually, and closely followed periods where supervised visitation transitioned into unsupervised visitation. Those regressions included various physical tics, encopresis, enuresis, disturbances in play patterns, a recurrence of issues previously worked through, misbehavior, and bursts of destructive energy. For R.S. and W.S., that list included verbalizations about coping with the stress and depression.

R.S., the oldest, had "a good sense of what she felt like was in her best interest and could identify it and express it well," and she expressed resentment at having been "parentified" to help raise her younger siblings while still a child herself. Spickelmier opined that "[s]he was just being re-traumatized and put right back in that parentified position of taking care of the kids again" during visitation. R.S., now "in a very different position where she's able to be a kid," thrived in her new environment, was making good grades, participated in school activities, had increased self-esteem, was proud of herself,

7

and started positively reporting new experiences. If R.S. returned to her past parentified position, Spickelmier thought she would be "re-traumatized again and could regress pretty significantly pretty quickly." Spickelmier worried about W.S. and how she struggled with her emotions and handling the setbacks to reintegration.

The children would get their hopes up for positive outcomes in this case, but a setback would occur and retraumatize the children "over and over again."

After the September 9, 2022 incident, W.S. reported to Spickelmier that it was good that visitation was once again supervised, and she was concerned about Mother's ability to parent the youngest children. At the time of the hearing, R.S. was no longer attending visitation, making W.S. the oldest visiting child, which caused concern that W.S. would soon take R.S.'s parentified role. W.S. told Spickelmier that she believed Mother was intoxicated during the September 9, 2022 incident. W.S. believed this based on Mother acting differently and not being the same person when she is intoxicated. Spickelmier opined that the children are familiar with drugs and alcohol and savvier than most children their age on that topic.

The children expressed to Spickelmier that they would not feel comfortable addressing their issues directly to Mother, so Spickelmier recommended family therapy. As a prerequisite to family therapy, Spickelmier wanted Mother to attend individual therapy so she could address individual issues first. Spickelmier and Mother's therapist were never able to set up family therapy.

Visits were supervised at the time of the hearing, and Spickelmier had concerns about visitation returning to unsupervised because of Mother's "[r]epeated patterns of codependent relationships, domestic violence issues, alcohol and drug issues, anger issues, lying issues, manipulation issues, [and] trying to get the kids to keep secrets." She was also concerned about how Cornerstones of Care was managing the case such as not

addressing Mother's role as an initiator of domestic violence or requiring that she receive individual counseling sooner. Spickelmier felt that the children deserved the chance to move forward with their lives and achieve stability, but that was not happening with Mother. Spickelmier felt that Grandmother and Grandfather were great placements for the children.

The State next called Marissa Scheele, a permanency and case manager at Cornerstones of Care. A longtime caseworker assigned to the children's case, De'Antrea McGowin, left employment at Cornerstones of Care in January 2023 and left no forwarding or contact information. Scheele affirmed that Mother and the children had not yet been able to attend family therapy because Mother had only recently begun individual therapy and because Spickelmier and her therapist were unable to coordinate a meeting to discuss family therapy by the hearing date. Cornerstones of Care records showed that on September 15, 2022, Mother submitted a urinalysis test positive for methamphetamine, benzodiazepines, and THC, and on October 3, 2022, Mother tested positive for benzodiazepines and oxycodone. Mother had a valid prescription for benzodiazepines at that time. Scheele described the back-and-forth nature of this case, where Mother oscillated between making progress and having significant setbacks. Mother's caseworkers had ongoing concerns about Mother's drug and alcohol use. Scheele saw Mother repeat the same patterns and behaviors of domestic violence and intoxication throughout the case.

Mother's individual therapist, Nancy McDurmond, testified next. McDurmond worked with Mother to cope with PTSD and how to identify feelings and express them to others. Mother never suggested to McDurmond that her boyfriend at the time of the September 9, 2022 incident was domestically violent. Mother disclosed her history of drug use, and McDurmond considered her primary drug to be alcohol.

As to the September 9, 2022 incident, Mother told McDurmond that W.S. was upset because their pet bearded dragon died, which caused her to call Grandmother and Grandfather and led to "some kind of blowup." McDurmond was unaware of issues the children were having with Mother and recommended increasing visitation so she could witness and address issues that came up with the children and Mother.

Autumn Graber, a case management specialist with Cornerstones of Care, then testified. Graber had only been assigned to the case since January 9, 2023. By the time Graber was assigned, Mother had completed most of her outstanding reintegration plan tasks, but she occasionally submitted positive urinalysis tests. Mother most recently tested positive for fentanyl on February 1, 2023. Mother disputed the positive test and requested Cornerstones of Care to pay for her to submit a second sample for testing, but that request was denied. Graber did not believe reintegration was viable.

Mother was the final witness called at the March 22, 2023 hearing. She identified the main concerns when the case started were housing, domestic violence, and alcohol abuse. She admitted that she abused alcohol at the start of the case and said she was an alcoholic in the sense that she used it but did not rely on it and was able to stop using it. Mother and Father, who she claimed was domestically violent, separated in 2021, and she denied that her boyfriend at the time of the hearing, and her boyfriend during the September 9, 2022 incident, were ever domestically violent. Mother was unaware whether the children felt unsafe at visits, and she tried to do various activities with them.

As to the September 9, 2022 incident, Mother did not think W.S. was afraid and instead was upset because the bearded dragon died while Mother was cooking dinner with P.S. and C.S. and thus could not provide W.S. comfort. Mother acknowledged that she had just gotten the bearded dragon within a week of September 9, 2022, and that day was the first time W.S. had ever met it. Mother thought the accusation that she was intoxicated that night came from her history with alcohol. She denied being intoxicated

that night. Instead, she claimed she had taken her prescribed doses of Xanax and doxepin, a sleeping medication, that could have been responsible for the perception that she was slurring her words. She denied that she told anyone that her boyfriend hit her that night or that he possessed methamphetamine. Mother had not heard Grandmother and Grandfather's claimed recording of their call with W.S. that night, and Mother did not talk to W.S. about that night afterward.

On cross-examination Mother acknowledged her history of alcohol abuse and denied a history of drug use. Mother claimed her November 4, 2021 DUI was eye opening and helped her achieve sobriety from alcohol.

After Mother's testimony concluded, the case was continued after the parties and GAL agreed it would be prudent to acquire and prepare Grandfather's recording of the September 9, 2022 call with W.S. for submission into evidence. The hearing was continued until April 19, 2023.

At the continued hearing, the State recalled Grandfather to testify. Grandfather recounted his attempt to call W.S. on September 9, 2022, after Father had called Grandmother and him. When W.S. called back on Grandmother's phone, Grandfather recorded the conversation on his phone. He continued recording until the police arrived at Mother's home. Excerpts of the recording were admitted into evidence and played in court with the district court's understanding that statements made by Father and Mother's boyfriend in the recording would not be considered because they were inadmissible hearsay. The recording is not included in the record on appeal.

The State rested, and the GAL admitted a letter from R.S. in lieu of having her testify. That letter is not part of the record on appeal. Mother, through counsel, also admitted several urinalysis receipts that she claimed were inconsistent with the positive

results in the case record. Mother did not call any witnesses. The district court heard closing arguments from counsel and took the matter under advisement.

The district court held its disposition hearing on June 14, 2023. The district court made robust findings of fact from the bench. It found Officer Allen's testimony to be credible and adopted it "as a whole in its findings of fact." The court then recounted Allen's testimony that he believed Mother was intoxicated during the September 9, 2022 incident and that others had told Allen that Mother was intoxicated, which did not draw an objection. The court also pointed out Allen's testimony that Mother was the disrupting and chaotic force that evening where others were calm.

Similarly, the district court found Grandmother's testimony to be credible and adopted it "as a whole in the Court's findings of fact." It pointed out her testimony of the children's regression after unsupervised visits as well as Mother's intoxication on September 9, 2022, and several other times throughout the case, including during visits with the children. The court next found that Grandfather had credibly testified and again adopted the testimony in whole to its findings of fact. The district court specifically found that Mother was intoxicated on September 9, 2022, that she was fighting with her boyfriend, and that domestic violence was involved.

The district court next found that Spickelmier credibly testified insofar as her testimony related to the diagnosis of the children, the progress they were making, and the regressions that C.S. and P.S. experienced. Spickelmier's testimony on the pattern of retraumatization, R.S.'s parentification, and Mother's codependency was also found to be credible. As to McDurmond's testimony, the court expressed concern that it appeared her only source of information was Mother, and it did not appear that Mother provided McDurmond with accurate information.

12

The district court found that Mother loved the children and wanted to reintegrate, but otherwise "there was not much that the Court found to be overly credible." The court found that she lied about the events of the September 9, 2022 incident and that the recording admitted by the State refuted her testimony that no domestic violence occurred that night. The court also focused on the February 1, 2023 positive urinalysis for fentanyl, which the court found did not occur as the result of her taking her prescribed medication.

After announcing its findings, the district court found that Mother was unfit to parent under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), and (b)(8). It further found that the State failed to meet its burden to prove unfitness under subsection (b)(7) but noted this failure benefitted Mother by allowing her to continue to receive and progress towards visitation despite concerns about her intoxication and continued alcohol usage. The district court found that Mother's unfitness was unlikely to change in the foreseeable future due to the three-year length of the case involving pendulum swings "as to whether or not Mother was in compliance with reintegration" and whether she was sober. The court noted that Mother's past conduct evidences that her unfitness is unlikely to change in the foreseeable future since every time she got close to making progress, then issues involving Mother's intoxication and alcohol addiction were raised. Last, the court found that termination was in the best interests of the children because they had been in a stable placement and because Spickelmier testified that anything outside of supervised visitation had been detrimental to the children even by that point, three years since the case began. The court referred to R.S.'s letter by noting that R.S. loved her mother but did not want to go back to her care.

The district court issued a journal entry on April 9, 2024, consistent with its findings from the bench, but adding a finding that Mother was unfit under K.S.A. 38-2271(a)(5). It also included a recitation of K.S.A. 38-2269(c)(3), but did not state how that subsection impacted the court's decision.

The Revised Kansas Code for Care of Children provides that the district court may terminate parental rights when a child has been adjudicated a child in need of care. K.S.A. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 38-2269(c). Any one of the factors in K.S.A. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(f).

> "Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. [Citation omitted.]" *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions about the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the care, custody, and control of the child, the parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021).

I. *Did the district court violate Mother's due process rights by applying the presumption of unfitness under K.S.A. 38-2271(a)(5)?*

Kansas statutes allow a court to presume a parent is unfit if it is established by clear and convincing evidence that the child has been placed outside the child's home "under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." K.S.A. 38-

14

2271(a)(5). Once the presumption is established, the burden shifts to the parent to rebut the presumption by a preponderance of the evidence. K.S.A. 38-2271(b).

In its journal entry, the district court made a presumption of unfitness finding under K.S.A. 38-2271(a)(5) in a separate, stand-alone paragraph. Mother claims the district court's finding of unfitness under K.S.A. 38-2271(a)(5) violated her right to due process because that subsection was not alleged in the State's motion to find her unfit and terminate her parental rights.

The State concedes that the K.S.A. 38-2271(a)(5) finding was erroneously included in the judgment but argues its inclusion did not violate Mother's rights because the district court did not apply the presumption in its decision. After a careful review of the record, we agree. The court never mentioned this presumption in its detailed ruling from the bench, nor did it explain how this presumption impacted its decision in the journal entry. The record is clear that the court did not shift the burden of proof to Mother on any of the allegations of unfitness. Further, the State did not allege this presumption applied nor did it argue at the hearing that it should. Instead, the case proceeded solely on unfitness under the factors listed in K.S.A. 38-2269. We therefore find Mother's rights were not violated by the district court's apparently mistaken mention of the presumption in its journal entry.

We also note that reversal is not required because, as explained below, we find sufficient evidence exists to support the district court's determination of unfitness under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), (b)(8), and (c)(3). See *In re J.S.*, 42 Kan. App. 2d 113, 119, 208 P.3d 802 (2009) (When termination is based on application of the statutory presumption and the determination that a parent is unfit under K.S.A. 38-2269, if sufficient evidence exists to support the determination based on the statutory factors of unfitness, reversal is not required.).

15

II. *Were the district court's findings of unfitness under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), (b)(8), and (c)(3) and the finding that Mother's unfitness was unlikely to change in the foreseeable future supported by sufficient evidence?*

Mother claims the district court lacked sufficient evidence to find her unfit to parent under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), (b)(8), and (c)(3). She also claims the district court lacked sufficient evidence to find her unfitness unlikely to change in the foreseeable future and that termination of her rights was in the children's best interests.

*K.S.A. 38-2269(b)(3) and (b)(8)*

Under K.S.A. 38-2269(b)(3), the district court may find Mother unfit for "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." A parent is unfit under K.S.A. 38-2269(b)(8) for "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

These factors may be taken up together because the evidence and arguments applying to each are nearly identical. The State argues that sufficient evidence supports both factors because the evidence shows Mother struggled with drugs and alcohol throughout this case. Mother disagrees and argues she denied drinking alcohol on September 9, 2022, she stopped drinking after her DUI in 2021, and she attended drug and alcohol classes as evidence undermining the district court's findings.

Allen testified that Mother slurred her words, had bloodshot eyes, was lethargic, and was going through "an emotional rollercoaster" as indicators to him that she was "clearly intoxicated" on September 9, 2022. Grandfather, an addiction counselor, testified that Mother was slurring her words that evening and emitted the distinct odor of alcohol. Grandmother testified that Mother smelled like alcohol that night and showed other signs

16

of intoxication such as the bearded dragon falling off her shoulder without her noticing. Both grandparents testified that Mother had reported being hit by her boyfriend that night. A similar incident had occurred in March 2021 where police were called to Mother's house during visitation because Mother was arguing and intoxicated.

More generally, Grandmother, Grandfather, Spickelmier, and Scheele testified that Mother had ongoing recurrences of intoxication and domestic violence throughout the pendency of this case. Grandmother described how she never knew when Mother would be intoxicated, including during visitation, and Grandfather was concerned about Mother's intoxication throughout the case. Spickelmier testified that Mother exhibited repeated patterns of drug and alcohol abuse throughout the case. And Scheele saw Mother repeat the same patterns and behaviors of domestic violence and intoxication throughout the case.

Mother focuses on her denial of drinking alcohol or using fentanyl but ignores that the district court found her testimony incredible. She also argues that Officer Allen did not smell a strong odor of alcohol on September 9, 2022, but ignores that he thought she was clearly intoxicated as she slurred her words and had bloodshot eyes. Moreover, Mother essentially asks this court to weigh conflicting evidence and reassess credibility, which it will not do. *In re Adoption of Baby Girl G.*, 311 Kan. at 806. In any event, Mother's evidence does not refute, for example, the positive fentanyl urinalysis on February 1, 2023, and does not overcome the remarkably consistent testimony from Allen, Grandmother, Grandfather, Spickelmier, Scheele, and Graber that Mother struggled with alcohol abuse not just on September 9, 2022, but throughout the case and even at times during visitation.

As for exposing the children to domestic violence, Grandmother and Grandfather testified that Mother told them her boyfriend had hit her on September 9, 2022. Both also testified W.S. had told them on the phone, while terrified, that Mother was fighting with

her boyfriend. Grandmother testified that a similar incident involving both intoxication and domestic violence had occurred in 2021. And Spickelmier testified that Mother generally followed a repeated pattern of domestic violence and played a role as an initiator.

Together this evidence supports a finding by clear and convincing evidence that Mother used intoxicating liquors or other substances during this case's pendency and as recently as a few months before the termination hearing. This is buoyed by Mother's opposing testimony being found incredible. The district court did not err in finding Mother unfit under K.S.A. 38-2269(b)(3).

Mother argues that she "clearly adjusted her circumstances, conduct or condition to reintegrate with her children." Thus, she argues that the district court erred in finding her unfit under K.S.A. 38-2269(b)(8). Her argument again focuses on her own testimony denying drug and alcohol use that was found to be incredible. Otherwise, she argues that she completed nearly all the reintegration plan tasks, divorced Father, requested family therapy, and attended individual therapy and therefore was changing her conduct or circumstances. But this evidence does little, in the light most favorable to the State, to refute the multiple witnesses who testified to Mother's continued drug or alcohol use or that Mother continued to initiate domestic violence with other men after divorcing Father. So while Mother took laudable strides in changing some of the conduct or circumstances that triggered this CINC case, the evidence is sufficient to clearly and convincingly show that she made little progress in the areas of domestic violence and drug or alcohol use. For that reason, we find the district court's finding of unfitness under K.S.A. 38-2269(b)(8) was supported by sufficient evidence.

18

*K.S.A. 38-2269(b)(2)*

A parent is unfit under K.S.A. 38-2269(b)(2) when they exhibit "conduct toward a child of a physically, emotionally or sexually cruel or abusive nature."

Mother raises similar arguments for why K.S.A. 38-2269(b)(2) is unsupported by sufficient evidence. The district court did not specify the findings that supported unfitness under this subsection. Mother concedes that Spickelmier testified the children were diagnosed with PTSD and would behaviorally regress as unsupervised visits resumed. Even so, she argues that she took steps to eliminate sources of emotional abuse, such as completing most of the reintegration tasks, attending individual therapy, requesting family therapy, and leaving and divorcing Father. But again, Mother focuses on the positive steps she took while ignoring that multiple witnesses credibly testified that over the course of nearly three years Mother maintained the same patterns of drug and alcohol abuse and domestic violence that she has had since the case began.

Beyond the evidence already addressed above, Spickelmier testified that the children would regress not just behaviorally, but in some cases physically, when unsupervised visits with Mother occurred. Spickelmier described unsupervised visitation with Mother as traumatizing. For example, some of the children would soil themselves after visits and some exhibited physical tics. They experienced disturbances in play patterns, a recurrence of issues previously worked through, misbehavior, and bursts of destructive energy. R.S. was "parentified" during unsupervised visits and resented that she had to take care of her younger siblings rather than be a child herself because Mother could not do so. W.S. was also concerned about Mother's ability to parent the children, and both she and Spickelmier worried that W.S. would take on R.S.'s parentified role if R.S. continued to avoid visitation.

19

Grandmother testified that R.S. and W.S. would verbalize their stresses about Mother and this case, C.S. and P.S. would fight, C.S. would get quiet, W.S. would scream in the middle of the night during dreams, P.S. and C.S. would also have bad dreams, and P.S. would talk in his sleep. P.S. would habitually clear this throat after unsupervised visits and a doctor concluded that the habit, along with a patch of eczema, was stress induced. Grandmother and Spickelmier each described the cycle of retraumatization the children went through as this case progressed and suffered setbacks usually related to alcohol and domestic violence. And Grandmother testified the children were afraid of being alone with Mother.

This evidence, along with the evidence of Mother's patterns of initiating domestic violence and intoxication, is sufficient to clearly and convincingly support a finding that Mother's behavior or her parenting style, her abuse of alcohol, and recurring involvement in domestic violence, scared the children—an emotional response. But more, visitation with Mother often triggered physical stress responses. Mother decries the evidence as too general and nonspecific, but even the specific evidence of Mother's DUI and the September 9, 2022 incident show a pattern that, in the light most favorable to the State, show that Mother struggled with alcohol and domestic violence, some of which she had a role in initiating. And the children still felt the emotional and physical effects of those actions when alone with Mother. For that reason, we find that sufficient evidence supports the district court's finding of unfitness under K.S.A. 38-2269(b)(2).

*K.S.A. 38-2269(b)(4)*

The district court considers under K.S.A. 38-2269(b)(4) any "physical, mental or emotional abuse or neglect or sexual abuse of a child."

20

This is perhaps the trickiest factor. The district court found that Mother was unfit under this factor for neglect but did not tie specific factual findings to that decision. K.S.A. 2023 Supp. 38-2202(z) defines neglect as:

"(z) 'Neglect' means acts or omissions by a parent, guardian or person responsible for the care of a child resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the child's parents or other custodian. Neglect may include, but shall not be limited to:

(1) Failure to provide the child with food, clothing or shelter necessary to sustain the life or health of the child;

(2) failure to provide adequate supervision of a child or to remove a child from a situation that requires judgment or actions beyond the child's level of maturity, physical condition or mental abilities and that results in bodily injury or a likelihood of harm to the child; or

(3) failure to use resources available to treat a diagnosed medical condition if such treatment will make a child substantially more comfortable, reduce pain and suffering, or correct or substantially diminish a crippling condition from worsening. A parent legitimately practicing religious beliefs who does not provide specified medical treatment for a child because of religious beliefs shall, not for that reason, be considered a negligent parent; however, this exception shall not preclude a court from entering an order pursuant to K.S.A. 38-2217(a)(2), and amendments thereto."

Mother argues there was no evidence presented that she failed to feed, clothe, shelter, provide supervision, or use resources to treat a medical condition. Therefore, she argues sufficient evidence cannot support neglectful conduct under K.S.A. 38-2269(b)(4). And to a point, Mother is correct. There was no evidence presented speaking to subsections (z)(1) or (z)(3) in the above definition of neglect. But in the light most favorable to the State, there was at least some evidence speaking to the second factor. For example, R.S. was parentified and had to take care of the children during unsupervised visits because Mother could not. W.S. was concerned about Mother's ability to parent the younger children and was concerned, as was Spickelmier, that she would also take on a

21

parent's role. This comes with a reasonable inference that the reason R.S. and W.S. had to look after the younger children was because Mother failed to provide adequate supervision. This inference is reinforced by the September 9, 2022 incident where the credible testimony showed Mother was intoxicated and fighting with her boyfriend while W.S. had to act as the adult in the house and bring her younger brothers into the bedroom and away from Mother and her boyfriend for safety. Certainly, young children caught in a loud verbal and potentially physical altercation between caregivers places them at physical, mental, and emotional risk. C.S. also verbalized to Spickelmier that supervised visitation made him feel safe, leading to a natural inference that he felt unsafe while unsupervised with Mother. And again, most of Mother's testimony in opposition was found incredible.

So while the evidence supporting this factor is on the lighter end of the spectrum, we still find it sufficient, when viewed in the light most favorable to the State, to support a clear and convincing finding that Mother, during unsupervised visits, would sometimes neglect the children's physical, mental, or emotional safety by being intoxicated during visits, being part of domestic violence during visits, or generally just not caring for the children's needs without other adult supervision or assistance from R.S. or W.S.—who are still children themselves.

*K.S.A. 38-2269(c)(3)*

As a threshold issue, the parties assert that the district court found Mother unfit to parent under K.S.A. 38-2269(c)(3). But the record does not support that the district court made that finding. In the disposition hearing, the district judge ruled from the bench that Mother was unfit to parent under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), and (b)(8), while finding that (b)(7) was not proven. There was no mention of K.S.A. 38-2269(c)(3) at the hearing. The amended journal entry terminating Mother's parental rights grouped K.S.A.

38-2269(b)(2), (b)(3), (b)(4), and (b)(8) together with specification that each subsection was found applicable. The journal entry then reads:

> "3. The Court does not make a finding under K.S.A. 38-2269(b)(7). Cornerstones of Care, specifically caseworker, De[']Antrea McGowan, failed to make reasonable efforts to rehabilitate the family.
>
> "In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:
>
> *failure to carry out a reasonable plan approved by the court directed toward the Integration of the child into a parental home; (K.S.A. 38-2269(c)(3)).*"

The journal entry merely recites the K.S.A. 38-2269(c)(3) language but does not specify whether the district court found Mother unfit thereunder. Each of the other subsections are specifically listed as either found or not found by the district court. Because the district court did not mention K.S.A. 38-2269(c)(3) in its bench findings, and because the amended journal entry does not make a finding one way or the other, we find that the district court did not rely on this factor in its termination decision. Even so, because we affirm the district court's findings under other statutory factors, the failure of the district court to address or make a finding under K.S.A. 38-2269(c)(3) is immaterial. K.S.A. 38-2269(f) (any one factor may, but does not necessarily, establish grounds for the termination of parental rights).

Therefore, we affirm the district court's findings of unfitness under K.S.A. 38-2269(b)(2), (b)(3), (b)(4), and (b)(8) and find the allegation of unfitness under K.S.A. 38-2269(c)(3) were not relied upon by the court in making its decision.

*Whether Mother's unfitness was unlikely to change in the foreseeable future*

Along with finding a parent unfit, a district court must find by clear and convincing evidence that the parent's unfitness is unlikely to change in the foreseeable

future. K.S.A. 38-2269(a). When assessing the foreseeable future, courts consider time in "'child time,'" a standard that recognizes that time, whether months or years, makes up a far greater proportion of a child's short life than an adult's longer life, and thus the passage of time may seem considerably longer through a child's perception. *In re M.S.*, 56 Kan. App. 2d 1247, 1263-64, 447 P.3d 994 (2019). Courts may consider past conduct as an indicator of future behavior. 56 Kan. App. 2d at 1264.

In finding that Mother's unfitness was unlikely to change in the foreseeable future, the district court emphasized that this case had been ongoing for about three years mostly filled with "pendulum swing[s]" where Mother would get close to reintegration only to have a major setback. The court also focused on Mother's inability to stay sober in the past as an indicator that Mother was unlikely to stay sober in the future. Mother raises the same arguments on this issue as she did with the other findings of unfitness, stating that she completed most of the reintegration plan, divorced father, attended therapy, participated in visits, and pushed for family therapy as reasons the district court erred. She also points to her denial of intoxication, which the district court found to be incredible.

After a review of the record, we affirm the district court's finding. First, the district court aptly pointed out that this case had been ongoing for quite some time—nearly three years. In that time Mother and the children were stuck in a cycle of getting close to reintegration only to have a setback usually involving intoxication or domestic violence. Indeed, in the months leading up to the termination hearing Mother was visibly intoxicated during an unsupervised visit on September 9, 2022, and produced a urinalysis positive for fentanyl on February 1, 2023. In child time, three years is a substantial period making up a major portion of each of the children's lifetimes. In that time, the children have not had the permanency a child needs and deserves. And Mother's past conduct, especially recent conduct, showed that Mother continued to struggle with intoxication, drug use, and domestic violence. That conduct suggests that Mother was unable or

24

unwilling to meaningfully change for the benefit of the children, and it clearly and convincingly supports a finding that she would be unable or unwilling to do so in the future.

*Best interests of the children*

After finding unfitness that is unlikely to change in the foreseeable future, the district court must then decide whether termination of parental rights is in the best interests of the child. *In re M.S.*, 56 Kan. App. 2d at 1264. The court gives primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1). Our Supreme Court recently addressed this factor and explained:

> "In assessing the child's physical, mental, and emotional health, the court may make a series of factual determinations. These factual findings may include, but are not limited to, personal features of the child's relationship with the parent and the harm that would come from losing the relationship and attachment, how a prospective adoptive placement for the particular child may work to counterbalance those harms, whether guardianship would better meet the physical, mental, or emotional needs of the child, and how the prospects for achieving permanency for the child will impact the child in terms of placement stability, placement disruptions, and aging out of the system." *In re D.G.*, 319 Kan. 446, 462, 555 P.3d 719 (2024).

As for our standard of review of the district court's findings on the best interests of the children, our court has reviewed such findings for an abuse of discretion since deciding it was the appropriate standard in *In re R.S.*, 50 Kan. App. 2d 1105, 1113-14, 336 P.3d 903 (2014). See *In re D.G.*, 319 Kan. at 462-63. While our Supreme Court did not weigh in on whether this is the correct standard, it acknowledged that our court has used this standard "in hundreds of cases since 2014." 319 Kan. at 462. Therefore we will continue to use this standard of review for a district court's best interests finding. A

district court abuses its discretion when no reasonable person would agree with the district court or the court's decision is based on a legal or factual error. 319 Kan. at 462.

Mother reasserts the same arguments she made regarding the district court's unfitness findings in support of her claim that it erred when finding termination was in the children's best interests: that she completed reintegration plan tasks, left and divorced Father, attended therapy, requested family therapy, and took part in visitation. As explained above, these arguments do little to speak to the core issues here—sobriety and domestic violence. For three years Mother has been on a pendulum swing of nearly achieving reintegration only to have a major setback, and those swings have been detrimental to the children. The children deserve permanency in their lives, and the evidence presented at the termination hearing shows they will not get that permanency with Mother.

We pause to reassert the sentiments we expressed in *In re R.S.*, which are equally applicable here:

> "'Cases like this are difficult ones. A parent may be labeled "unfit" under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time.' [Citation omitted.]" 50 Kan. App. 2d at 1118.

For that reason, the district court did not abuse its discretion to find termination of Mother's parental rights was in the best interests of the children.

Affirmed.

26