NOT DESIGNATED FOR PUBLICATION

Nos. 128,597
128,598

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of F.M. and J.M.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Submitted without oral argument. Opinion filed September 19, 2025. Affirmed.

*Kaitlin M. Dixon*, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., COBLE and BOLTON FLEMING, JJ.

PER CURIAM: The natural father (Father) of F.M. (born 2014) and J.M. (born 2020) appeals the district court's termination of his parental rights to his two children. He argues the district court's finding of unfitness was not supported by clear and convincing evidence and the district court abused its discretion by finding that F.M.'s and J.M.'s best interests were served by termination. After a thorough review of the record, we find no error and thus affirm the termination of Father's parental rights.

1

FACTUAL AND PROCEDURAL BACKGROUND

In August 2022, the State filed a Child in Need of Care (CINC) petition, alleging that F.M., J.M., and their two older half-siblings (who are not part of this appeal) were without proper care due to factors including emotional abuse, homelessness, and Mother's drug use when they were taken into custody. At the time of the petition, Father was incarcerated at the Cherokee County jail. After a hearing, the district court found the children to be in need of care and placed them in custody of the Department for Children and Families (DCF).

*Parental Right Termination Proceedings*

In March 2024, the State moved to terminate Father's parental rights, alleging he was unfit under these statutory factors:

- K.S.A. 38-2269(b)(5): conviction of a felony and imprisonment;
- K.S.A. 38-2269(b)(8): lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child; and
- K.S.A. 38-2269(c)(3): failure to carry out a reasonable plan approved by the court directed toward the integration of the children into the parental home.

The district court held an evidentiary hearing on the State's motion to terminate the parental rights of Mother and Father to F.M. and J.M. in June 2024. Mother did not appear. The district court took judicial notice of Father's prior criminal convictions in the cases below:

- 1999 CR 001969: possession of cocaine with intent to sell
- 1999 CR 001768: forgery

- 2001 CR 000036: possession of cocaine
- 2003 CR 001570: possession of cocaine after two priors
- 2009 CR 001515: theft
- 2009 CR 003973: theft after prior conviction
- 2013 CR 001032: theft after prior conviction
- 2013 CR 001286: aggravated assault
- 2013 CR 002604: robbery
- 2020 CR 001949: robbery

The State called three witnesses: Father, Billie Walker, and Braeden Starlin-Driver. Father testified but did not call any witnesses. We summarize the testimonies below.

*Father's Testimony*

At the time of the hearing, Father was incarcerated at the Hutchinson Correctional Facility where he had been for the last eight months as the result of a robbery conviction. Before that, he was in the Sedgwick County jail for approximately two years. And before that, he lived with his father in Park City for approximately six months after moving out of an apartment shared with Mother. Father acknowledged that from 1999 to the date of the termination hearing, he had spent more time incarcerated than not.

To improve his ability to parent his children, Father was enrolled in a parenting class, had completed a substance abuse program, and was participating in an aftercare substance abuse class. He had obtained a psychological evaluation and engaged with the prison's mental health unit. He was on the waiting list for a program that helps offenders reenter society after incarceration and helps them find housing and employment.

Father was unsure of his exact anticipated release date from prison, but he estimated it to be between January and May 2025. He believed he had only one disciplinary incident during his current incarceration. This occurred after he had a seizure that made his pupils dilate, which caused prison staff to believe he was in an "altered state" from substance use. During his periods of incarceration, Father had 67 disciplinary incident reports.

As for Father's relationship with his children, he tries to write them letters at least once a month. F.M. would write him back and J.M. would send him drawings. The last letter Father had received from F.M. was three weeks earlier; it read: "I love you, Daddy. I miss you. Come—come stay with us. Don't break my heart. I love you, Daddy. I miss you." Mother would visit Father, and Father tried to organize a phone call between him and the children during Mother's visits, but those efforts were unsuccessful because Mother did not bring her phone with her to the visits. Father agreed that this lack of personal contact was not an "ideal situation," but he was doing the best he could. He stated: "I don't have any money on my books. I can only send four letters out a month. There's not a lot that I can do. I do what I can. I do—I do what—if I could do more, I would, but I can't."

Father had seen J.M. once after she was born. But he had seen F.M. more; he lived with her before moving in with his father before his most recent incarceration. They would go to the park and spend time together. But as of the hearing, he had not seen F.M. in person for approximately three years. Because of his convictions, he had been incarcerated all of J.M.'s life and about half of F.M.'s life.

Father had a hard time identifying the case manager in his parental rights case because of staffing changes. He felt he had not been included in the case in a meaningful way. He only learned that he needed to begin complying with court orders in the case when he met with his attorney the previous May.

4

Father expressed some internal conflict when asked how long he thought the children should have to wait for permanency. He did not think they should have to wait another year while he awaited his release and he did not want them left in limbo, but he also expressed a strong desire to be a part of their lives and to fulfill his role as a father. He stated that the children would rather be with him than in a foster home.

When asked how the district court could be assured, especially considering his extensive criminal history, that Father would not reoffend upon release and return to incarceration, Father focused on his most current robbery conviction. He emphasized that he had not robbed anyone and said the sentencing judge had recognized that fact so had given him a break on his sentence.

When asked what made him a good father, he responded that when he was not incarcerated and lived with Mother and F.M., he would leave work and go directly to pick her up from school and do her homework with her. He acknowledged that the COVID-19 pandemic disrupted that routine and that schooling at home presented unique challenges. Yet he maintained that he was present in the children's lives, provided for them consistently, and had never let them down.

Father acknowledged that he had never lived independently with the children, nor had he solely cared for them full time. In any event, he could do so and had previously cared for F.M. for shorter periods of time on his own when Mother was away for the weekend. When he was not incarcerated, he financially supported his children and Mother's other children.

When questioned about his criminal history, Father admitted he had several past convictions, but he "straightened up" once he had kids. It was "unfair" to use his most recent incarceration to show he was unfit because his most recent offense was done in self-defense.

Father asked the district court to keep his children in temporary foster care until he was released from prison, at which point he hoped to show his capacity to parent F.M. and J.M. He had lined up postrelease housing and employment and was willing to do whatever it took to get his children back when he was released. Upon release, he expected to reside in a halfway house for 30 days and then live with his father if he could not secure other housing.

Father also addressed his disciplinary record while in prison. For the disciplinary action in 2024, he was working as a cell house porter and had just finished cleaning when he experienced a seizure. A correctional officer found him on the floor showing seizure-like symptoms and called for medical assistance. A nurse concluded that he was under the influence of a substance—based on the dilation of his pupils—despite his explanation that he has a documented seizure disorder. He requested a urinalysis to rule out substance use, but he did not get one.

Father also addressed two other writeups related to contraband. The first, alleged to be rolled tobacco, was just toilet paper Father used for shading his artwork. The second regarded the possession of sexual material, but Father was unaware of any such material in his cell, and he saw nothing during his disciplinary hearing to support this disciplinary action. He had had several disciplinary incidents in the past, but he asserted he had matured during his most recent incarceration and was focused on bettering himself to reunite with his children.

*Walker's Testimony*

Walker testified next. She became involved in the case in November 2022 as a supervisor for St. Francis Ministries, which works with DCF. She holds master's degrees in both criminal justice and social work. Due to high caseloads and low staffing, she took on dual responsibilities in the case, adding the case manager role in April 2023.

6

When asked if anything about Father's testimony concerned her, Walker testified that during their case plan meeting in November 2023, Hutchinson Correctional Facility had told her they did not provide mental health services, contrary to Father's assertions. Thus, she was concerned that Father had not addressed his mental health issues and would need to do so upon his release from prison. Father would also need to complete a clinical assessment and follow all its recommendations. She believed it would take Father between six and nine months after his release to complete his mental health tasks.

Walker met with Father in June 2023 and discussed the court orders. During that meeting, she specifically outlined the case plan tasks that he could complete while incarcerated and the services available to him to do so.

She agreed that Father had written letters for F.M., but the case team gave the letters to F.M.'s therapist to deliver to F.M. when appropriate, so not all of Father's letters were given to F.M. This was because Father made promises in the letters that he could not currently fulfill, but that F.M. would rely on, asking the case team when she was going home with Father. Father would write to F.M. that she and J.M. were going home with him, that Mother was doing better, and that Mother would make sure the children were home and safe.

Walker then outlined the other court orders Father had to complete, including maintaining employment, maintaining housing, maintaining sobriety, and complying with his violent offender registration requirements. In the best-case scenario, if Father were released and began immediately working on these case plan tasks it would take six to nine months to be able to complete his requirements. Walker expressed that she was concerned because of Father's extensive criminal history that he would slip up and be incarcerated again.

Walker agreed that F.M. was aware of Father's incarceration and continued to express a strong emotional attachment to him. But she had become anxious because of Father's unkept promises. F.M. was anxious when Mother visited and she could not talk to Father on the phone. After missed visits and unfulfilled promises, F.M. would tell Walker she believed that Mother and Father did not care about her. Walker had seen behavioral issues with J.M., such as throwing tantrums, wetting the bed, hitting others, and being out of control during visits with Mother.

F.M. was in weekly therapy and had been since October 2022 and had recently started a medication plan for her mental health. She would become emotionally dysregulated and had anxiety about her living situation. During therapy, she expressed a lot of anxiety about going home and where she would live.

Because Father is incarcerated, there had been no in-person visits in the case. Reintroduction concerned Walker because Father had been incarcerated all of J.M.'s life and half of F.M.'s life. Walker was concerned about restarting in-person visits with the children immediately upon Father's release from prison because J.M. would be "unsure" of their interactions (as she did not know him) and F.M.'s mental health could be negatively impacted by her uncertainty about Father's living situation upon his release. F.M. had been in foster care during other referrals while Father was incarcerated and so uncertain living situations caused her lots of anxiety.

Walker believed it would be harmful for F.M. to wait another year for Father to be discharged from prison because it delayed permanency, which the children deserve. She noted that children experience time differently than adults, and that time seems longer to children, so it would be harmful to a child to wait several years for Father to be released from prison and begin to work on the case plan tasks. If Father were not incarcerated, he could be considered for placement. Still, she would not recommend placing the children

8

with him because he had not completed his case plan tasks necessary for reintegration. She believed adoption was best for the children's physical, mental, and emotional needs.

*Starlin-Driver's Testimony*

Last to testify was Starlin-Driver, a permanency specialist at St. Francis Ministries. He holds a bachelor's degree in social work. He took over managing F.M.'s and J.M.'s case from Walker in November 2023, approximately seven months prior.

During his time as case manager, the children had not given him any letters to send to Father, and their foster home placement had not asked him about doing so. Neither F.M. nor J.M. had asked him about Father, which concerned him. He was concerned that J.M. did not know Father at all and that the relationship between F.M. and Father was not as strong as Father had testified.

Starlin-Driver testified that for reintegration to occur, Father would need to work through a therapeutic process to reinstate contact between him and the children, which would likely take six months to a year. But before that process could begin, it was likely that the children and Father would need to complete an assessment to determine whether redeveloping the relationship between Father and F.M. and forming a new relationship between Father and J.M. was a viable option. Starlin-Driver estimated that the assessment process would take more than three months after Father's release before visits and the reintegration process could even begin.

Starlin-Driver did not think that it was in the children's best interests to wait until Father was released from prison to give them permanency. He believed it was in their best interests to be adopted.

9

*The District Court's Decision*

After hearing the testimony and reviewing the admitted exhibits, the district court terminated Father's parental rights to F.M. and J.M. It found clear and convincing evidence that Father was unfit because of conduct or condition which rendered him unable to properly care for the children and that conduct or condition was unlikely to change in the foreseeable future.

To make its finding of unfitness, the district court relied on the same statutory factors of unfitness the State alleged in its petition. It found that DCF had made reasonable efforts to reintegrate the children, but given Father's incarceration, there was little more DCF could have done.

The district court identified Father's incarceration as the central issue. Father had been incarcerated since the case began and remained incarcerated at the time of the termination proceedings. By this own admission, from 1999 to 2024 Father had spent more time in prison than out of prison. The district court calculated that Father had been incarcerated for 25 years of his life and, based on Father's age of 41 when the case was filed, that meant Father had spent over half of his life in prison.

The district court noted that Father did not have a home for reintegration and did not have viable employment waiting for him after his release from prison. The district court considered whether Father's condition would change in the foreseeable future and found it likely that Father would be incarcerated again, based on his criminal conduct during the past 25 years of his life.

The district court also considered the best interests of the children. It was not convinced that Father had changed, as he claimed. Rather, Father continued to commit

felonies after the children were born, and criminal activity was not in the best interests of the children. The district court made these determinations based on child time.

The district court then held that, in giving primary consideration to the physical, mental, and emotional health of F.M. and J.M., the needs of the children would be best served by terminating Father's parental rights. It found more than sufficient testimony that the children were adversely affected by the ongoing lack of stability in their lives.

Father timely appeals the district court's order terminating his parental rights. We consolidated the two cases—one for each child—on appeal.

DID THE DISTRICT COURT ERR BY FINDING FATHER UNFIT?

The district court must make three findings before terminating parental rights. The court must find by clear and convincing evidence that the parent is unfit, and that the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. It must also find by a preponderance of evidence that termination of parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). Father challenges each of these findings.

*Standard of Review*

A natural parent who has assumed parental responsibilities has a fundamental constitutional right to a parental relationship with his or her child protected by the Kansas and United States Constitutions. *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). The State may extinguish the legal bond between a parent and a child only upon clear and convincing proof of parental unfitness. *Santosky v. Kramer*, 455 U.S. 745,

11

753-54, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008).

> "(a) When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). An appellate court cannot "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

Clear and convincing evidence of a single statutory factor of unfitness under K.S.A. 38-2269(b) can be a sufficient basis for a district court's determination that a parent is unfit. K.S.A. 38-2269(f). Here, the district court found Father unfit to parent F.M. and J.M. based on K.S.A. 38-2269(b)(5), (b)(8), and (c)(3).

Father argues that the district court's finding of current unfitness and unfitness for the foreseeable future was not supported by clear and convincing evidence because he demonstrated a good-faith effort to comply with his case plan, rehabilitate himself, and maintain meaningful involvement in his children's lives. We disagree.

*K.S.A. 38-2269(b)(5)—conviction of a felony and imprisonment*

As for this statutory factor of unfitness, the district court held:

"Here's the real problem with the case, is that [Father] has been incarcerated since this case was filed. Further, he has spent—by his own testimony, he has spent more time in prison than out of prison from a period of 1999 to 2024. I calculate 25 years. Based on his age when this was filed at 41, he had spent over half of his life at that time in prison."

This finding of unfitness was based on clear and convincing evidence. The criminal files the district court took judicial notice of and Father's own testimony sufficiently support the district court's findings.

Father also testified that because he had been incarcerated, he had only seen J.M. once in her life, right after she was born, and had seen F.M. only about half of hers. There were no in-person visits due to Father's incarceration.

Father claimed that he maintained contact with the children by sending them letters. Yet Walker testified that the letters he sent were not always provided to the children because of the promises Father made in them. Rather, the therapist held on to the letters until the children were in a state to receive and process them. And Starlin-Driver stated that the children and their foster home placement had not given him any letters to send to Father, nor had the foster home placement asked about how to send letters. Although Father was incarcerated, he failed to fulfill "the core elements of parental care—bonding, decision-making, emotional support, and provision for the child's needs—through alternative means." *In re K.W.D.*, 321 Kan. __, 573 P.3d 221, 230 (2025); see, e.g., *In re T.H.*, 60 Kan. App. 2d 536, 494 P.3d 851 (2021) (reversing termination where incarcerated father maintained weekly contact with child, designated a trusted caregiver, sent financial support, and completed all reintegration tasks available in prison).

Father acknowledged that he would be incarcerated approximately another 11 months from the date of the termination hearing. He asserted that he had become a

responsible adult since having children. But the evidence shows that he was incarcerated for crimes he committed *after* the children's births and that he had prison disciplinary issues in 2015, 2016, 2018, and 2024.

This evidence meets the required standard of clear and convincing evidence that Father was unfit due to his conviction of a felony and imprisonment under K.S.A. 38-2269(b)(5). The district court did not err in finding Father unfit under this factor.

*K.S.A. 38-2269(b)(8)—failure to adjust circumstances, conduct, or conditions*

K.S.A. 38-2269(b)(8) permits a finding of unfitness when there is a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

Father argues that his actions reflected a genuine and sustained effort to adjust his life to meet his parental responsibilities and thus the district court erred when it determined that he was unfit under K.S.A. 38-2269(b)(8). He argues that once he was informed of his court orders, he worked diligently toward completing his case plan tasks. Even so, the evidence shows otherwise.

Past behavior is a strong indicator of his future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982) (explaining a court may predict a parent's future unfitness based on parent's history). Father did not change his behavior to demonstrate he could appropriately parent his children. He claimed that he had become a responsible adult after his children were born, but he was incarcerated at the time of the evidentiary hearing for actions he took following J.M.'s birth.

Furthermore, and glaringly, he testified that he did not actually commit the crime he was currently serving time for, and that the sentencing judge knew this, so that is why

14

he received a shorter sentence. He claimed that the convictions resulted from a "misfortunate circumstance" rather than accepting responsibility for his conduct that prevented him from seeing J.M. for her entire life and F.M. for half of hers. Yet in his motion for a downward dispositional departure in his criminal case, Father stated that he took "ownership and full responsibility" for his actions and admitted that what he did was "foolish and stupid." That court granted him a durational departure due to his acceptance of responsibility and the time he had spent in custody. Given his testimony at the termination hearing, we see no evidence that Father had truly accepted responsibility or made any change to reform his chronic criminal behavior.

"[T]he adjustment of circumstances, conduct, or conditions addressed in K.S.A. 38-2269(b)(8) speaks to a *permanent* change of the environmental circumstances, personality traits, relationship issues, or personal habits that led to the child's removal from the home in the first place." (Emphasis added.) *In re F.J.*, No. 127,187, 2024 WL 4521812, at *9 (Kan. App. 2024) (unpublished opinion). This "secondary change" is an internalization of what a parent has learned during the rehabilitation process and demonstrates a true change in the parent's ability to care for their child, not just a mere checking off of tasks on a case plan—it is meaningful and lasting change. See *In re P.H.*, No. 121,808, 2020 WL 3022869, at *6 (Kan. App. 2020) (unpublished opinion) (noting that parent failed to implement secondary change and failed to adjust circumstances to meet needs of the child).

Clear and convincing evidence shows that Father failed to adjust his circumstances, conduct, or conditions to meet the needs of the children. In fact, the case ended just as it began—with Father incarcerated. The district court did not err by finding Father unfit under K.S.A. 38-2269(b)(8).

We find it unnecessary to determine whether Father was also unfit under K.S.A. 38-2269(c)(3)—failure to carry out a reasonable reintegration plan.

15

*Unfitness Unlikely to Change for the Foreseeable Future*

In addition to finding that clear and convincing evidence supports one or more bases for terminating Father's rights, the district court also found that Father's unfitness to parent his children was unlikely to change in the foreseeable future. K.S.A. 38-2269(a). "'The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them.'" *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024). Additionally, a district court "'may look to a parent's past conduct as an indicator of future behavior' and give weight to actions over intentions." 319 Kan. at 459; *In re Price*, 7 Kan. App. 2d at 483. There is no set amount of time in which failed reintegration proves the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. *In re D.G.*, 319 Kan. at 459. And "[t]he law does not require the court to experiment with the child's welfare to see if he [or she] will suffer great detriment or harm." *In re Price*, 7 Kan. App. 2d at 480.

We recognize that Father testified that his incarceration would soon end. Still, the district court properly considered the steps Father would have to take after being released to properly care for his children.

> "In assessing whether the conduct or condition rendering the parent unable to care properly for the child is unlikely to change in the foreseeable future, the inquiry does not end merely because the underlying condition—such as incarceration—has a defined endpoint. The statutory framework does not treat a parent's release from incarceration as the definitive point at which their ability to provide proper care is restored. . . . Rather, K.S.A. 38-2269(a) directs courts to make a forward-looking assessment of whether the parent will be able to care properly for the child in the near term, considering all relevant circumstances. For purposes of imprisonment, this includes not only the projected release date, but also the time and resources required for the parent to secure housing,

16

employment, treatment, and rebuild the parent-child relationship." *In re K.W.D.*, 573 P.3d at 231.

Viewing the facts together, we find clear and convincing evidence supporting the district court's findings that the conditions that rendered Father currently unfit would not change for the foreseeable future, especially when we view those facts in "child's time."

Throughout the entire 22 months that the case had been open, Father was incarcerated. And he had been incarcerated for approximately two years before the case was filed. Further, based on his history of long periods of incarceration off and on for the past 25 years of his life, the court had sufficient evidence to believe that his actions would cause him to be incarcerated in the future because, as discussed, we may predict a parent's future unfitness based on his past history. See *In re D.G.*, 319 Kan. at 459.

And even if Father immediately began working the case upon his release in 11 months from the date of the termination hearing, based on the case worker's testimony, in a "best case" scenario it would take another six months to a year from that date before the children could be reintegrated.

While we do not doubt that Father loves his children, they have spent lengthy portions of their lives separated from him due to his unfitness—half of F.M.'s life and all J.M.'s life. Asking the children to wait another year or two for Father to potentially achieve reintegration is not something the law demands.

Based on child's time, the record contains sufficient evidence that Father's conduct and conditions rendering him unfit were unlikely to change in the foreseeable future.

17

DID THE DISTRICT COURT ABUSE ITS DISCRETION BY FINDING TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN?

Lastly, we address Father's contention that the district court erred by terminating his parental rights because it was not in the best interests of the children.

Once a court makes a finding of unfitness, the court must then consider whether termination of the parental rights is in the best interests of the child while giving primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1) ("If the physical, mental or emotional needs of the child would best be served by termination of parental rights," the court shall terminate the parental rights to best serve those needs.).

When making this determination, the district court should consider the relationship between the parent and children and the trauma that may be caused by termination. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010). In addition to the relationship between parent and child, the court also considers any detriment to the physical, mental, or emotional health of a child if parental rights are not terminated, as well as the benefits of permanency. See K.S.A. 38-2269(g)(1); *In re K.R.*, 43 Kan. App. 2d at 904.

We review the best interests determination for abuse of discretion. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017). "A court exceeds its broad latitude if its ruling stems from an error of law or fact or is 'arbitrary, fanciful, or unreasonable.'" *In re C.T.*, 61 Kan. App. 2d 218, 227, 501 P.3d 899 (2021) (quoting *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 [2013]). The party claiming an abuse of discretion—Father—bears the burden of establishing such abuse. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012); *In re P.J.*, 56 Kan. App. 2d 461, 466, 430 P.3d 988 (2018).

Father argues that termination of his parental rights was not in the best interests of his children and that the evidence suggested that reintegration was not only feasible but would better meet the emotional needs of the children, who had a deep bond with him. But the evidence presented to the court contradicts Father's claim.

It shows that J.M. was three years old and had only seen Father in person once in her life—right after she was born. Father admitted that he had been incarcerated for the entirety of J.M.'s life. Father also admitted that he had been incarcerated for half of F.M.'s life. He stated that the last time he saw F.M. was while he was in prison, but it is not clear when or where this visit occurred.

Walker testified that there had been no in-person visits between Father and the children during the case. Starlin-Driver testified that in the seven months he had been assigned as the case manager, neither child asked him about their father. This caused him to be concerned that J.M. did not know who Father was and concerned him that the relationship between F.M. and Father was not as strong as Father had said.

Father acknowledged that his children had never lived with just him as the primary care provider. He agreed that the children needed permanency, and that they should not have to wait for his release from prison to obtain it; still, he wanted his children to wait because he wanted to be a dad. This equivocating suggests that Father was unwilling to prioritize the needs and best interests of his children above his own.

F.M., who was 10 years old at the time of the termination hearing, was experiencing mental health and emotional struggles because of the case and her lack of permanency. Walker testified that F.M. participated in weekly therapy because she could get emotionally dysregulated and had started medication for her mental health. F.M. had a lot of anxiety about when she would be going home, and the type of home to which she would be returning. She would cling to the promises Father made in his letters, and then

19

when she could not speak to Father during Mother's visits, she would believe that Father did not care about her.

Neither Walker nor Starlin-Driver believed it would be in the best interests of the children to wait for Father to be released from prison. Walker testified that the delay in permanency would delay the ability of the children to feel safe, comforted, and able to live a good life. Both Walker and Starlin-Driver testified that it would be best for the children's physical, mental, and emotional needs to be adopted.

Given this evidence, the district court did not abuse its discretion by finding that it was in the best interests of the children to terminate Father's parental rights.

The district court properly weighed the conflicting testimony and addressed the factors required by law. We find no error in its decision.

Affirmed.